SQUIRE, COLLECTOR OF INTERNAL REVENUE,
*v.* CAPOEMAN ET UX.

No. 134.  Argued January 19, 1956.—Decided April 23, 1956.

2

*Charles F. Barber* argued the cause for petitioner. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Holland, Hilbert P. Zarky* and *Carolyn R. Just.*

*John W. Cragun* argued the cause for respondents. With him on the brief were *Glen A. Wilkinson* and *Robert W. Barker.*

Briefs of *amici curiae* urging affirmance were filed by *George W. Shoemaker* for the Coeur d'Alene Tribe of Indians et al., and *Houston Bus Hill, Wm. C. Leahy, Wm. J. Hughes, Jr., Roy St. Lewis* and *Carl L. Shipley* for Taunah et al.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question presented is whether the proceeds of the sale by the United States Government of standing timber on allotted lands on the Quinaielt Indian Reservation may be made subject to capital-gains tax, consistently with applicable treaty and statutory provisions and the Government's role as respondents' trustee and guardian.

When white men first came to the Olympic Peninsula, in what is now the State of Washington, they found the Quinaielt Tribe of Indians and their neighboring allied tribes occupying a tract of country lying between the

Coast Range and the Pacific Ocean. This vast tract, with the exception of a small portion reserved for their exclusive use, was ceded by the Quinaielts and their neighbors to the United States in exchange for protection and tutelage by the treaty of July 1, 1855, and January 25, 1856, 12 Stat. 971. According to this treaty, the Quinaielts were to have exclusive use of their reservation "and no white man shall be permitted to reside thereon without permission of the tribe . . . ." Article II. Years later, Congress passed the General Allotment Act of 1887.[1] Thereunder, Indians were to be allotted lands on their reservations not to exceed 160 acres of grazing land or 80 acres of agricultural land,[2] and 25 years after allotment the allottees were to receive the lands discharged of the trust under which the United States had theretofore held them, and to obtain a patent "in fee, discharged of said trust and free of all charge or incumbrance whatsoever," [3] though the President might extend the period.[4]

Respondents, husband and wife, were born on the reservation, and are described by the Government as full-blood, noncompetent Quinaielt Indians. They have lived on the reservation all their lives with the exception of the time served by respondent husband in the Armed Forces of the United States during World War II.

Pursuant to the treaty and under the General Allotment Act of 1887, respondent husband was allotted from the treaty-guaranteed reservation 93.25 acres and received

---

[1] 24 Stat. 388, 25 U. S. C. § 331 *et seq.*

[2] 25 U. S. C. § 331.

[3] *Id.,* § 348.

[4] *Ibid.* The trust period here involved has regularly been extended by Executive Order. See note following 25 U. S. C. § 348, and see 25 U. S. C. § 462, which provides: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress."

4

a trust patent [5] therefor dated October 1, 1907.[6]   During the tax year here in question, the fee title to this land was still held by the United States in trust for him, and was not subject to alienation or encumbrance by him, except with the consent of the United States Government, which consent had never been given.   The land was forest land, covered by coniferous trees from one hundred years to several hundred years old.   It was not adaptable to agricultural purposes, and was of little value after the timber was cut.

In the year 1943, the Bureau of Indian Affairs of the United States Department of the Interior entered into a contract of sale for the standing timber on respondent's allotted land for the total price of $15,080.80.   The Government received the sum of $8,418.28 on behalf of respondent in that year.[7]

---

[5] The term "patent" inadequately describes respondent's interest. "Congress . . . was careful to avoid investing the allottee with the title in the first instance, and directed that there should be issued to him what . . . is in reality an allotment certificate . . . ." *Monson* v. *Simonson,* 231 U. S. 341, 345.

[6] In pertinent part, the patent provides:

"Now know ye, That the United States of America, in consideration of the premises, has allotted, and by these presents does allot, unto the said Horton Capoeman, the land above described, and hereby declares that it does and will hold the land thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian, and that at the expiration of said period the United States will convey the same by patent to said Indian, in fee, discharged of said trust and free of all charge or incumbrance whatsoever, . . . ."

[7] This sale seems to have followed a pattern generally adopted by the Government in selling timber from Indian allotments.   Huge areas of forest are put up for competitive bids by lumber companies. These tracts include the tribal forest lands and individual allotments, with the consent of tribal councils and individual allottees.   The successful bidder is required to make an immediate advance payment

Upon demand of petitioner, Collector of Internal Revenue for the District of Washington, respondents filed a joint income tax return on October 10, 1947, for the tax year 1943, reporting long-term capital gain from the sale of the timber in that year. Simultaneously, they paid the taxes shown due. Thereafter, they filed a timely claim for refund of the taxes paid and contended that the proceeds from the sale of timber from the allotted land were not subject to federal income taxation because such taxation would be in violation of the provisions of the Quinaielt Treaty, the trust patent, and the General Allotment Act. The claim for refund was denied, and this action was instituted. The District Court found that the tax had been unlawfully collected and ordered the refund. 110 F. Supp. 924. The Court of Appeals, agreeing with the District Court but recognizing a conflict between this case and the decision of the Tenth Circuit in the case of *Jones* v. *Taunah,* 186 F. 2d 445, affirmed. 220 F. 2d 349. Because of the apparent conflict, we granted certiorari. 350 U. S. 816.

The Government urges us to view this case as an ordinary tax case without regard to the treaty, relevant statutes, congressional policy concerning Indians, or the

of a large proportion of the estimated value of the lumber in the tract. Since as much as 640 million board feet have been sold at one time, this requirement makes it economically infeasible for any but the largest companies to submit bids. The uncertainties of such large scale operations, which are to be carried on over 25- or 30-year periods, coupled with local quality and accessibility variables, has resulted in substantially lower than prevailing market bids. In some instances, the return to other sellers of comparable timber was two or three times that received by the Indians. See Transcript of November 28, 1955, Joint Hearing of Subcommittee on Legislative Oversight Function of the Senate Committee on Interior and Insular Affairs and of Subcommittee on Public Works and Resources of the House Committee on Government Operations, 2151–2217, and *passim.*

guardian-ward relationship between the United States and these particular Indians. It argues:

"As citizens of the United States they are taxable under the broad provisions of Sections 11 and 22 (a) of the Internal Revenue Code of 1939, which imposes a tax on the net income of every individual, derived from any source whatever. There is no exemption from tax in the Quinaielt Treaty, the General Allotment Act, the taxing statute, or in any other legislation dealing with taxpayers' affairs. . . .

"Even if it be assumed that the United States would be prohibited from imposing a direct tax on the allotted land held in trust for the taxpayers, there would, nevertheless, be no prohibition against a federal tax on the income derived from the land, since a tax on such income is not the same as a tax on the source of the income, the land." [8]

We agree with the Government that Indians are citizens and that in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens. We also agree that, to be valid, exemptions to tax laws should be clearly expressed. But we cannot agree that taxability of respondents in these circumstances is unaffected by the treaty, the trust patent or the Allotment Act.

The courts below held that imposition of the tax here in question is inconsistent with the Government's promise to transfer the fee "free of all charge or incumbrance whatsoever." Although this statutory provision is not expressly couched in terms of nontaxability, this Court has said that

"Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards

---

[8] Brief for Petitioner, pp. 7–8.

of the nation, dependent upon its protection and good faith. Hence, in the words of Chief Justice Marshall, 'The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.' *Worcester* v. *The State of Georgia,* 6 Pet. 515, 582." *Carpenter* v. *Shaw,* 280 U. S. 363, 367.

Thus, the general words "charge or incumbrance" might well be sufficient to include taxation. But Congress, in an amendment to the General Allotment Act, gave additional force to respondents' position. Section 6 of that Act was amended to include a proviso—

"That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent . . . ."[9]

The Government argues that this amendment was directed solely at permitting state and local taxation after a transfer in fee, but there is no indication in the legislative history of the amendment that it was to be so limited.[10] The fact that this amendment antedated the federal income tax by 10 years also seems irrelevant. The

[9] 25 U. S. C. § 349.

[10] See S. Rep. No. 1998, 59th Cong., 1st Sess.; H. R. Rep. No. 1558, 59th Cong., 1st Sess.

literal language of the proviso evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee. This, in turn, implies that, until such time as the patent is issued, the allotment shall be free from all taxes, both those in being and those which might in the future be enacted.[11]

The first opinion of an Attorney General touching on this question seemed to construe the language of the amendment to Section 6 as exempting from the income tax income derived from restricted allotments.[12] And even without such a clear statutory basis for exemption, a later Attorney General advised that he was—

> "[U]nable, by implication, to impute to Congress under the broad language of our Internal Revenue Acts an intent to impose a tax for the benefit of the Federal Government on income derived from the restricted property of these wards of the nation; property the management and control of which rests largely in the hands of officers of the Government charged by law with the responsibility and duty of protecting the interests and welfare of these dependent people. In other words, it is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian." [13]

Two of these opinions were published as Treasury Decisions.[14] On the basis of these opinions and decisions, and a series of district and circuit court decisions, it was said by Felix S. Cohen, an acknowledged expert in

---

[11] This provision was relied upon by Chief Judge Phillips, dissenting in *Jones* v. *Taunah,* 186 F. 2d 445, 449.

[12] 34 Op. Atty. Gen. 275, 281 (1924). And see *id.,* 302 (1924).

[13] *Id.,* 439, 445 (1925). This ruling was followed in 35 Op. Atty. Gen. 1 (1925). And cf. *id.,* 107 (1926).

[14] T. D. 3570, III–1 Cum. Bull. 85 (1924); T. D. 3754, IV–2 Cum. Bull. 37 (1925).

Indian law, that "It is clear that the exemption accorded tribal and restricted Indian lands extends to the income derived directly therefrom." [15]   These relatively contemporaneous official and unofficial writings are entitled to consideration.   The Government makes much of a subsequent Attorney General's opinion,[16] which expressly overruled an earlier opinion,[17] on the authority of *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U. S. 418.

That case is distinguishable from the case at hand.   It involved what the Court characterized as "income derived from investment of surplus income from land," [18] or income on income, which Cohen termed "reinvestment income."   The purpose of the allotment system was to protect the Indians' interest and "to prepare the Indians to take their place as independent, qualified members of the modern body politic." *Board of Commissioners* v. *Seber*, 318 U. S. 705, 715.   To this end, it is necessary to preserve the trust and income derived directly therefrom, but it is not necessary to exempt reinvestment income from tax burdens.   It is noteworthy that the *Superintendent* case did not involve an attempt to tax the land "surplus." [19]

---

[15] Cohen, Handbook of Federal Indian Law, 265.   He distinguished cases permitting the imposition of income taxes upon income derived from unrestricted lands, and upon reinvestment income. *Id.*, at 265–266.   Mr. Cohen was Chairman of the Department of Interior Board of Appeals, and Assistant Solicitor of the Department.   The Handbook has a foreword by Harold L. Ickes, then Secretary of the Interior, and was printed by the United States Government Printing Office.

[16] 39 Op. Atty. Gen. 107 (1937).

[17] 34 *id.*, 439.

[18] 295 U. S., at 421.

[19] The Government also relies upon *Choteau* v. *Burnet*, 283 U. S. 691, but that case also is not controlling, since it held only that a *competent* Indian, who had unrestricted control over lands and

The wisdom of the congressional exemption from tax embodied in Section 6 of the General Allotment Act is manifested by the facts of the instant case. Respondent's timber constitutes the major value of his allotted land. The Government determines the conditions under which the cutting is made.[20] Once logged off, the land is of little value.[21] The land no longer serves the purpose for which it was by treaty set aside to his ancestors, and for which it was allotted to him. It can no longer be adequate to his needs and serve the purpose of bringing him finally to a state of competency and independence. Unless the proceeds of the timber sale are preserved for respondent, he cannot go forward when declared competent with the necessary chance of economic survival in competition with others. This chance is guaranteed by the tax exemption afforded by the General Allotment Act, and the solemn undertaking in the patent. It is unreasonable to infer that, in enacting the income tax law, Congress intended to limit or undermine the Government's undertaking. To tax respondent under these circumstances would, in the words of the court below, be "at the least, a sorry breach of faith with these Indians."[22]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

income therefrom, was not exempt from income tax solely because of his status as an Indian. Such a tax is specifically authorized by Section 6 of the General Allotment Act.

[20] See *United States* v. *Eastman*, 118 F. 2d 421.

[21] See 220 F. 2d, at 350. In its answer filed in the District Court, the Government admitted that the lands "are generally unsuitable for agricultural purposes . . . ." R. 31.

[22] 220 F. 2d 350.

MR. JUSTICE REED, dissenting.

My view is that the sale price of the timber in excess of its market value on March 1, 1913, was a capital gain, subject to federal income tax. *Jones* v. *Taunah,* 186 F. 2d 445. Cf. *Choteau* v. *Burnet,* 283 U. S. 691; *Superintendent* v. *Commissioner,* 295 U. S. 418. The gain is taxable income like the value of annual crops.