ROGER A. JOURDAIN AND MARGARET E. JOURDAIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6021–76.     Filed March 8, 1979.

*Rodney J. Edwards*, for the petitioners.
*Robert F. Cunningham*, for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax and additions thereto as follows:

| Year | Deficiency | Addition to tax Sec. 6651(a) | Sec. 6653(a) |
|------|-----------|------------------------------|--------------|
| 1971 | $3,231.63 | --- | $161.58 |
| 1972 | 3,549.91 | $49.62 | 177.50 |

Due to a concession by respondent, the issues remaining for our consideration are: (1) Whether income received by petitioner Roger A. Jourdain from the Red Lake Band of Chippewa Indians Tribal Council for services rendered as its tribal chairman and other income earned by petitioner from private sources con-

stitute taxable income or whether such items are exempt from income tax, and (2) whether the additions to tax under sections 6651(a) and 6653(a)[1] were properly imposed.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Roger A. and Margaret E. Jourdain, husband and wife, filed joint income tax returns using the cash method of accounting for the years 1971 and 1972 with the Internal Revenue Service Center, Ogden, Utah. Petitioners resided at the Red Lake Indian Reservation, Red Lake, Minn., at the time their petition herein was filed. Because Margaret Jourdain is a petitioner herein solely by reason of her filing jointly with her husband, all references hereafter to petitioner are solely to Roger Jourdain.

Petitioners maintained their legal residence at Red Lake Indian Reservation, Red Lake, Minn., at all times material to this case. Both petitioners were and remain duly enrolled members of the Red Lake Band of Chippewa Indians. However, petitioners do not possess certificates of competency from the United States Government.[2]

The Red Lake Band of Chippewa Indians is an American Indian tribe. A peace treaty known as the Treaty of Greenville between the United States and several Indian tribes including the Chippewas was signed on August 3, 1795. The treaty provided, in pertinent part, as follows:

### ARTICLE V

*Indians have right to hunt on lands relinquished by U.S. & c.*

To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is this: The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue.

[2] A noncompetent Indian, as the term is used here, is one who holds allotted lands only under a trust patent and may not dispose of his property without the approval of the Secretary of the Interior. The term does not denote mental incapacity. *Stevens v. Commissioner,* 452 F.2d 741, 742 n.1 (9th Cir. 1971), affg. in part and revg. in part 52 T.C. 330 (1969), Supplemental Opinion 54 T.C. 351 (1970).

when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same. And the said Indian tribes again acknowledge themselves to be under the protection of the said United States and no other power whatever.

## ARTICLE VI

*Indians may expel settlers from their lands.*

If any citizen of the United States, or any other white person or persons, shall presume to settle upon the lands now relinquished by the United States, such citizen or other person shall be out of the protection of the United States; and the Indian tribe, on whose land the settlement shall be made, may drive off the settler, or punish him in such manner as they shall think fit; and because such settlements made without the consent of the United States, will be injurious to them as well as to the Indians, the United States shall be at liberty to break them up, and remove and punish the settlers as they shall think proper, and so effect that protection of the Indian lands herein before stipulated.

## ARTICLE VII

*Indians may hunt on lands ceded to U.S.*

The said tribes of Indians, parties to this treaty, shall be at liberty to hunt within the territory and lands which they have now ceded to the United States, without hindrance or molestation, so long as they demean themselves peaceably, and offer no injury to the people of the United States.

## ARTICLE VIII

*Trade to be opened with the Indians.*

Trade shall be opened with the said Indian tribes; and they do hereby respectively engage to afford protection to such persons, with their property, as shall be duly licensed to reside among them for the purpose of trade, and to their agents and servants; but no person shall be permitted to reside at any of their towns or hunting camps as a trader, who is not furnished with a license for that purpose, under the hand and seal of the superintendant of the department north-west of the Ohio, or such other person as the President of the United States shall authorize to grant such licences; to the end, that the said Indians may not be imposed on in their trade. And if any licensed trader shall abuse his privilege by unfair dealing, upon complaint and proof thereof, his licence shall be taken from him, and he shall be further punished

according to the laws of the United States. And if any person shall intrude himself as a trader, without such license, the said Indians shall take and bring him before the superintendant or his deputy, to be dealt with according to law. And to prevent impositions by forged licences, the said Indians shall at least once a year give information to the superintendant or his deputies, of the names of the traders residing among them. [Reproduced literally.]

The Red Lake Band is located on the Red Lake Indian Reservation (hereafter reservation) within the boundaries of the State of Minnesota. The reservation consists of approximately 750,000 acres of common tribal land held in trust by the United States Government for the benefit of the Red Lake Band. The jurisdiction of the Red Lake Band extends to all land on the reservation in Minnesota. The Red Lake Band's governing body consists of eight district representatives and three officers (chairman, secretary, and treasurer) who make up the elected representatives of the tribal council. Petitioner has continuously served as council chairman since his first election to that office in 1959 through the date of trial of this case (March 1977).

At all relevant times, the Red Lake Band possessed the right of self-government. Its revised constitution and bylaws provide, in pertinent part, that "All reservation land shall remain tribal property and shall neither be sold or divided by allotment." Consequently, tribal property cannot be alienated or transferred by the Red Lake Tribal Council or any member of the Red Lake Band.

Other than a land-use permit issued to him by the Red Lake Band Council for a homesite and garden on the Red Lake Indian Reservation, petitioner, during the years at issue or at any time material herein, has never been the recipient of an allotment, as that term is commonly understood under the provisions of the General Allotment Act of 1887 (25 U.S.C.A. sec. 331 et seq.),[3] or by reason of any agreement or treaty.

---

[3]Under this act, Indians were to be allotted lands on their reservations not to exceed 160 acres of grazing lands or 80 acres of agricultural land; 25 years after allotment, the allottees were to receive the lands discharged of the trust under which the United States had theretofore held them, and to obtain a patent "in fee, discharged of said trust and free of all charge or incumbrance whatsoever," though the President might extend the period. The trust period has regularly been extended by Executive Order. See also 25 U.S.C.A. sec. 462 which provides that "the existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress."

The tribal council has the authority, subject to limitations imposed by its constitution or laws of the Federal Government, to administer any funds within the control of the Red Lake Band, including payment of salaries and expenses of tribal officers or employees. All such salaries and expenses were authorized by resolution duly enacted by the Red Lake Band. The funds used to pay petitioner's salary were advances disbursed from trust funds held by the United States Government for the Red Lake Band. The trust fund consists of tribal receipts from royalties, leases, and other sources together with accrued interest earned on the tribal funds while held in trust by the Government.[4] These funds were distributed after approval by the Secretary of Interior through the Bureau of Indian Affairs (BIA), Red Lake Agency accounting office, by issuing checks to the Red Lake Band tribal treasurer in response to the tribal council's quarterly budget request, approved by tribal resolution, for operating funds. The budget request specified the amount the tribe was to receive for the administration of the tribal council. The funds were then disbursed by the treasurer of the Red Lake Band Council for operating expenses of the council, including officers' salaries. It was impossible to identify what part of the trust funds distributed to the tribe constituted principal and what part constituted interest earned on the principal while held in trust.

During the years 1971 and 1972, the tribal council paid petitioner income identified as chairman's salary in the amounts of $15,750 and $18,000, respectively. The tribal council withheld both income tax and FICA tax from petitioner's wages, and petitioner will be entitled to receive Social Security benefits when he becomes eligible. In addition to his salary as chairman, petitioner received funds totaling $266.92 and $290.38 in 1971 and 1972, respectively, from the tribal council in excess of his allowable employee business and travel expenses incurred on behalf of the tribal council. Petitioner did not include these amounts in gross income on either his 1971 or 1972 income tax returns.

Petitioner received additional income of $2,420 and $2,245 in 1971 and 1972, respectively, identified as consultant and execu-

---

[4] It appears that the Government retains 10 percent of the tribe's timber royalties as administration expenses.

tive fees from Rural Minnesota CEP, Inc., Detroit Lakes, Minn., which he also did not report as gross income in either year. Petitioner also received income of $175 in 1971 from the University of Minnesota and $10 in 1971 from the State of Minnesota, Department of Indian Affairs, which he did not report on his 1971 income tax return.

Respondent determined that petitioner's salary earned as chairman, the additional income he earned as consulting and executive fees from Rural Minnesota CEP, the amounts earned from the University of Minnesota and the Minnesota Department of Indian Affairs, and the excessive reimbursement for travel expenses incurred on behalf of the Red Lake Band Council constitute taxable income.

## ULTIMATE FINDING OF FACT

Petitioner's failure to file income tax returns and to pay the taxes due was due to reasonable cause and not the result of negligence or intentional disregard of rules and regulations.

## OPINION

Petitioner first argues that because there is no specific reference to income taxation of Indians in either the Internal Revenue Code of 1954 or any prior revenue act, Indians are exempt from its operation. Alternatively, petitioner argues that because the compensation he received as tribal chairman was paid solely from income received by the Red Lake Band from the sale or lease of resources from their Reservation, the income is exempt from Federal income taxes under article I, section 2, clause 3 of the United States Constitution; the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C.A. sec. 331 et seq.; and the Treaty of Greenville, Aug. 3, 1975, 7 Stat. 49. Respondent maintains that Indians are subject to income tax unless specifically exempted; that neither the Constitution, General Allotment Act, nor Treaty of Greenville exempts petitioner from paying Federal income taxes; and, therefore, petitioner must include all compensation in income.

In support of his contention that, because there is no specific reference to income taxation of Indians in either the Internal Revenue Code of 1954 or any prior revenue act, Indians are excluded from its operation, petitioner relies on the rule as stated in *Elk v. Wilkins*, 112 U.S. 94, 100 (1884), that "general acts

of Congress [do] not apply to Indians, unless so expressed as to clearly manifest an intention to include [Indians]."

The starting point for our analysis is *Walker v. Commissioner*, 37 T.C. 962 (1962), revd. in pertinent part 326 F.2d 261 (9th Cir. 1964).[5] In *Walker*, the question presented us was whether a noncompetent Indian was taxable on compensation received as elected treasurer of the tribal community out of funds which had their source in receipts and revenues that the tribe as a whole derived directly from "tribal lands" (i.e., those portions of the reservation which had not yet been allotted to particular Indians but which were held by the Government for the use and benefit of the tribe as a whole). The facts in the present case are not distinguishable. In both instances, the recipient of compensation was a noncompetent Indian living on an Indian reservation; the compensation was to a member of the tribal council which had a large measure of responsibility for deciding how revenues were to be disbursed; the tribal land had not been allotted to any particular Indians but was held by the Government in trust for the use and benefit of the tribe as a whole; and the funds used to pay the taxpayer had their source in receipts and revenues which the tribe as a whole derived directly from tribal lands held by the Government in trust for the use and benefit of the tribe.[6]

We did not base our holding in favor of the taxpayer in *Walker* upon any treaty or upon the General Allotment Act, but rather by emphasizing the guardian-ward relationship existing between the United States and noncompetent Indians. We found that the amount paid to the treasurer was in reality a distribution to him as one of the beneficiaries of the trustee tribal funds and "the mere fact that such amount was fixed by reference to his services as community treasurer does not warrant a characterization of the same as 'wages.'" *Walker v. Commissioner*, 37 T.C. at 972.

We no longer believe this reasoning is valid and we hold that

---

[5]Petitioner does not argue on brief that our decision in *Walker v. Commissioner*, 37 T.C. 962 (1962), should be controlling here. Nonetheless, since we find the facts in this case to be indistinguishable from the facts in *Walker v. Commissioner*, we must deal with that case.

[6]Some of the funds used to pay petitioner here were derived from interest these funds earned while held in trust by the Government. Respondent contends that if we find petitioner's salary to be tax exempt because it was derived directly from tribal lands, nonetheless, the interest factor is taxable as reinvestment income under the rationale that interest income derived from investment of surplus funds from land is not exempt income. Because we hold that petitioner's salary is taxable, we need not deal with this particular refinement. Cf. *Superintendent of Five Civilized Tribes v. Commissioner*, 295 U.S. 418 (1935).

the theory of the guardian-ward relationship upon which we relied in *Walker* is no longer a consideration in the tax status of Indians.

We agree, therefore, with respondent that petitioner must show that he is specifically entitled to an exemption from taxation. In *Squire v. Capoeman*, 351 U.S. 1, 6 (1956), the Supreme Court stated that "Indians are citizens and * * * in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens." The cases following *Squire v. Capoeman* have since maintained that Indians are subject to income tax unless exempted by treaty or Act of Congress. *LaFontaine v. Commissioner*, 533 F.2d 382 (8th Cir. 1976), affg. T.C. Memo. 1975–165;[7] *Holt v. Commissioner*, 364 F.2d 38 (8th Cir. 1966), cert. denied 386 U.S. 931 (1967), affg. 44 T.C. 686 (1965); *Commissioner v. Walker*, 326 F.2d 261 (9th Cir. 1964), affg. in part and revg. in part 37 T.C. 962 (1962); *Estate of Shelton v. Commissioner*, 68 T.C. 15, 21 (1977), on appeal (10th Cir., Aug. 19, 1977). See also *Superintendent of Five Civilized Tribes for Sandy Fox, Creek No. 1268 v. Commissioner*, 295 U.S. 418 (1935); *Choteau v. Burnet*, 283 U.S. 691 (1931). Therefore, the rule of *Elk v. Wilkins* has been modified, and it is now quite clear, as pointed out by the Court of Appeals in reversing our decision in *Walker*, that:

> A general Act of Congress applying to all persons includes Indians and their property interests. Sections 1 and 61(a) * * * subject to income of "every individual" to tax, and include income "from any source whatever" that is not elsewhere specifically excluded. Because the Internal Revenue Code is a general Act of Congress, it follows that Indians are subject to payment of federal income taxes, as are other citizens, unless an exemption from taxation can be found in the language of a Treaty or Act of Congress. [*Commissioner v. Walker, supra* at 263; citation omitted.]

See also *Estate of Shelton v. Commissioner, supra; Holt v. Commissioner, supra.*[8]

Petitioner's next argument is that U.S. Const. art. I, sec. 2, cl.

---

[7]In *LaFontaine v. Commissioner*, T.C. Memo. 1975–165, affd. 533 F.2d 382 (8th Cir. 1976), we relied on this language to hold that Article VI of the United States Constitution does not exempt wages earned by a certified member of the Turtle Mountain Band of Chippewa Indians from a private employer.

[8]Some courts have at times recognized a limited exception to the rule that a general Act of Congress applying to all persons includes Indians. See, e.g., *United States v. White*, 508 F.2d 453 (8th Cir. 1974), where the court noted that areas traditionally left to tribal self-government, and most often the subject of treaties, have enjoyed an exception from this general rule. Clearly, taxation would not come within this exception.

3, is, in conjunction with U.S. Const. amend. XIV, sec. 2, a constitutional limitation on Congress' power to tax Indians who were not taxed at the time the Constitution was ratified (at least as to those tribes identified as such at that time).

Congress' power to levy taxes is subject to certain limitations, including U.S. Const. art. I, sec. 2, .cl. 3, which states, in part:

direct taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a term of Years, *and excluding Indians not taxed*, three fifths of all other Persons * * * [Emphasis supplied.]

This clause also provided that apportionment in the House of Representatives was to be on the same basis as the apportionment of direct taxes. The 14th Amendment, sec. 2, later amended this by providing, in pertinent part: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each state, *excluding Indians not taxed.*" (Emphasis supplied.)

Petitioner contends that the phrase *"excluding Indians not taxed"* provides the constitutional limitation on taxing Indians who were not taxed at the time the Constitution was ratified. Although respondent apparently concedes that the Red Lake Bank constitutes Indians who were identified in the United States Constitution as Indians not taxed at the time of its adoption, he contends that the phrase "Indians not taxed" does not restrain the Federal Government from taxing Indians but refers only to State taxation of Indians.[9]

We believe that the clause in article I is an apportionment provision designed to establish the method of computing the number of representatives for each State and determine apportionment of direct taxes among the States. The phrase "Indians not taxed," when viewed in context, is clearly descriptive, describing the fact that some Indians are not taxed by the State in which they reside and should, therefore, be excluded from the enumeration of its population. It does not restrain the Federal Government from taxing Indians.[10]

Petitioner next relies on *Squire v. Capoeman, supra,* in which

---

[9]In *Commissioner of Taxation v. Brun,* 286 Minn. 43, 174 N.W.2d 120 (1970), it was held that the State of Minnesota did not have the power to impose a State income tax on the Red Lake Band, at least as to income derived from sources within the reservation.

[10]See *United States V. Kagama,* 118 U.S. 375, 378 (1886); *Elk v. Wilkins,* 112 U.S. 94 (1884).

the Supreme Court interpreted the General Allotment Act of 1887 to exempt certain income of an Indian from Federal taxation. *Squire v. Capoeman* is distinguishable from the present case. There, the Court held only that proceeds from the sale of standing timber on a parcel of reservation land that had been allotted to a noncompetent Indian resident of the reservation and held in trust under the General Allotment Act were not subject to Federal income tax. Since there has been no allotment of land to petitioner here, the exemption does not by its terms apply. *Fry v. United States,* 557 F.2d 646, 648 (9th Cir. 1977), cert. denied 434 U.S. 1017 (1978).

Even if we assume that it is not necessary to actually allot the land under the Supreme Court's decision in *Squire v. Capoeman* in order to exempt income (see *United States v. Anderson,* 442 F.Supp. 10 (D. Mont. 1977)), and that under the General Allotment Act income directly derived from tribal lands is not taxable either to the tribe or to a member of the tribe who receives his derivative, pro rata share of such tribal income, we do not believe petitioner has established that he is entitled to have his income exempt from taxation. Cf. *Choteau v. Burnet, supra; Hayes Big Eagle v. United States,* 156 Ct. Cl. 665, 300 F.2d 765 (1962). Petitioner's salary did not represent his pro rata share of tribal income. Rather, his wages were solely for his benefit, obtained through his labor, and we do not believe, therefore, that his wages were directly derived from the land. Nonetheless, petitioner argues that his management of tribal land is a necessary part of deriving (tax exempt) income from the land, and that to tax his income from management of the land is to thereby indirectly tax the land itself. However, it does not follow that income received by an employee as compensation for services rendered the tribe is tax exempt because the income earned by the tribe through (in part) his services is tax exempt. *Fry v. Commissioner, supra; Walker v. Commissioner, supra.* We conclude, therefore, that no Act of Congress prevents taxation in this instance.

Nor do we believe that the Treaty of Greenville prohibits imposition of the Federal income tax on petitioner's wages and other income received. Petitioner relies on article V of the treaty which states:

To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the

meaning of that relinquishment is this: The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in their quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same. * * *

Petitioner emphasizes the phrase "without any molestation from the United States" and contends that imposition of an income tax would involve an unwarranted intrusion by the United States into Indian affairs.

We do not believe that the language quoted above expresses any intention of exempting the Red Lake Band from taxation. This is especially true when the language of article VII is compared to the language in article V:

The said tribes of Indians, parties to this treaty, shall be at liberty to hunt within the territory and lands which they have now ceded to the United States, without hindrance or molestation, so long as they demean themselves peaceably, and offer no injury to the people of the United States.

It is apparent that the molestation the parties had in mind was interference in the Indians' rights to hunt, etc., not the right to be free from taxation. Although ambiguities in treaties are to be resolved in favor of Indians, we are not free to create favorable rules, and the Supreme Court has applied the rule that tax exemptions are not granted, by implication, to Indians. See *Fry v. Commissioner, supra.* Accordingly, we hold that petitioner may not exclude his income from taxation.

We must now deal with the sections 6651(a) and 6653(a), additions.

Petitioner does not set forth any reason for late filing or failure to report consulting fees, honorariums, and excessive reimbursements for travel expenses, relying entirely upon his contention that such amounts (including the wages received as chairman) were excludable from gross income. We infer from this that the only reason petitioner filed a return was to obtain a refund of taxes withheld from his salary as chairman, no return otherwise being required if his income was tax exempt. Presumably, because no tax was withheld from petitioner's income except for his salary, he did not report any additional income. In determining whether the additions to tax under sections 6651(a) and 6653(a) were properly imposed, the issue is thus the narrow

one of whether petitioner's belief that his income was tax exempt, although mistaken, was reasonable.

In view of our position in *Walker v. Commissioner, supra,* we have no problem in finding that petitioner was reasonable in his belief that his salary as chairman was tax exempt, and respondent does not contend otherwise. Once petitioner assumed that his salary as chairman was exempt, his other income was insufficient in the aggregate amount to be subject to income tax in 1972. Therefore, we hold that petitioner is not liable for the additions to tax in 1972.

This is not the case for 1971, however, and petitioner's income, aside from his salary as tribal chairman, is sufficient in amount to be taxed.[11] Nonetheless, because of the special status of the Red Lake Band and petitioner's apparently sincere, albeit erroneous, belief that the United States Constitution and the Treaty of Greenville protected any member of the Red Lake Band living on the reservation from Federal taxation of income derived from any sources, we hold for petitioner on this issue in 1971.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

---

[11]Petitioner's other income for 1971 totaled $2,871.92 ($266.92 excess reimbursement; $2,420 consulting fee; $175 from University of Minnesota; and $10 from the Minnesota Department of Indian Affairs). The low income allowance in 1971 for a joint return was $1,050, and petitioner was entitled to two exemptions (his and his wife's) worth a total of $1,350. This results in taxable income of $471.92.