*Decisions will be entered under Rule 155.*

WILLIAM HOPTOWIT AND ELAINE A. HOPTOWIT, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7095–79, 7096–79, 7097–79.     Filed January 28, 1982.

*Robert Wayne Bjur*, for the petitioners.
*Thomas N. Tomashek*, for the respondent.

FEATHERSTON, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 7095–79 | William Hoptowit and Elaine A. Hoptowit | 1975 | $12,608.40 |
| 7096–79 | Elaine A. Hoptowit | 1976 | 1,216.00 |
| 7097–79 | William H. Hoptowit | 1976 | 38,484.38 |

In an amendment to his answer, respondent alleges an increased deficiency in the income tax of petitioner William H. Hoptowit for 1976 (docket No. 7097–79) resulting from the

---

[1] Cases of the following petitioners are consolidated herewith: Elaine A. Hoptowit, docket No. 7096–79, and William H. Hoptowit, docket No. 7097–79.

inclusion of an additional $9,000 in his taxable income for that year. It has been agreed that there is no deficiency in the income tax of petitioner Elaine A. Hoptowit for 1976 (docket No. 7096–79).

The issues for decision are:

(1) Whether income earned by an enrolled member of the Yakima Indian Nation from the sale of tobacco products in a "smokeshop" on the Yakima Reservation is subject to Federal income taxation.

(2) Whether amounts received in return for services performed as a member of the Yakima Tribal Council are subject to Federal income taxation.

### FINDINGS OF FACT

Petitioners William H. Hoptowit and Elaine A. Hoptowit, husband and wife, resided in Toppenish, Wash., at the time they filed the petitions herein. They filed a joint Federal income tax return for 1975 and separate (as married individuals filing separately) Federal income tax returns for 1976 with the Internal Revenue Service Center, Ogden, Utah.

Petitioner William H. Hoptowit (hereinafter petitioner) is a noncompetent, enrolled member of the Yakima Indian Nation (the tribe).[2] During 1975 and 1976, he owned and operated a business in Mabton, Wash., known as the Mabton Smokeshop (the smokeshop). The smokeshop business was conducted within the boundaries of the Yakima Indian Reservation (sometimes referred to as the reservation) on property held in trust for the benefit of another member of the tribe. The property, known as Allotment No. Odd Tract No. 5076, was held by petitioner under a lease prepared and approved by the U.S. Department of the Interior, Bureau of Indian Affairs, in accordance with applicable regulations.[3]

---

[2]The term "noncompetent Indian," as used in cases such as the instant one, refers to one who has been allotted land that is held in trust for him by the United States and who, therefore, may not alienate or encumber that land without the consent of the United States. The term does not denote mental incapacity. See *Stevens v. Commissioner*, 452 F.2d 741, 742 n. 1 (9th Cir. 1971), affg. in part and revg. in part 52 T.C. 330 (1969), supplemental opinion 54 T.C. 351 (1970).

[3]Allotment No. Odd Tract No. 5076 is held in trust pursuant to the provisions of the General Allotment Act of 1887, ch. 119, 24 Stat. 388, 25 U.S.C. sec. 331, et seq. Under this act, as amended, Indians were to be allotted up to 160 acres of grazing land or 80 acres of

Petitioner was authorized to conduct his smokeshop business by the Yakima Tribal Council (the council), the governing body of the tribe. The council permitted petitioner to operate the business during 1975 and 1976 in accordance with Resolution T–22–75, which had been adopted by the council on September 10, 1974. The resolution provided that only members of the tribe could obtain permits to operate smokeshops and be employed at smokeshops on the reservation. Under the resolution, petitioner was required to purchase all of his cigarette inventory from the tobacco warehouse of the tribe, which he did.

One of the council's purposes in adopting Resolution T–22–75 was to obtain funds through tribal taxation of cigarette sales in order to provide social services for needy members of the tribe. The resolution was approved by the Secretary of the Interior. The Bureau of Indian Affairs administered the distribution of, and payments received for, cigarettes wholesaled by the tribe.

During 1975 and 1976, petitioner derived net profits from his smokeshop business in the respective amounts of $40,308.10 and $70,993.52.[4] Petitioner reported these profits from the operation of his business on Schedule C of the joint Federal income tax return that he filed for 1975 and on Schedule C of the separate Federal income tax return that he filed for 1976; however, he excluded the profits from his reported gross income on the ground that they were exempt from taxation pursuant to the treaty with the Yakimas, 12 Stat. 951 (1855) (the treaty).

During 1976, in addition to operating the smokeshop, petitioner served as an elected member of the council. The

---

agricultural land on their reservations. The land so allotted was to be held in trust by the United States, for the "sole use and benefit" of the Indian allottee, for a period of 25 years (longer in the discretion of the President). At the end of the trust period, the land was to be conveyed to the allottee, "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." See also the Indian Reorganization Act of 1934, ch. 576, sec. 2, 48 Stat. 984, 25 U.S.C. sec. 462, which provides: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress."

[4] These net profits figures are the amounts reported by petitioner on his returns less the deductions for the expense of an office in the home allowed by respondent in the notices of deficiency.

council, which consists of 14 members who serve 4-year terms,[5] was established in its present form by a resolution of the general council adopted in 1944.[6]

As governing officials, members of the council have the duty to protect and preserve the treaty and to continuously serve the best interests of the people of the tribe. In performing their duties, council members are required to travel a great deal to hearings and meetings concerning the tribe. They receive per diem payments for days on which they actually serve in their official capacity. The per diem amounts are determined by the council in its annual budget resolution, which is subject to the approval of the Bureau of Indian Affairs.

During 1976, petitioner received from the tribe per diem payments totaling $18,000 in return for services performed as a member of the council. The funds from which petitioner's per diem payments were made were originally held in trust by the U.S. Government for the benefit of the tribe.[7] These funds were distributed to the tribe in accordance with the council's annual budget resolution. The tribe did not withhold income or FICA taxes from the $18,000 paid to petitioner for his services as a council member, and he did not include that amount in his taxable income for 1976.

The Yakima Indian Reservation comprises 1,367,405 acres. Of this acreage, 842,978 acres are tribally owned, 274,988 acres are allotted to tribal members, 23 acres are Government owned, and 249,416 acres are owned by non-Indians. These lands were reserved from some 10,800,000 acres that were ceded to the United States in the treaty. Article II of the treaty provides that the reservation "shall be set apart * * * for the exclusive use and benefit" of the tribe. The treaty further provides, in pertinent part, as follows:

---

[5]Seven members are elected every 2 years.

[6]The general council comprises all members of the tribe. Members of the council are elected by the general council. As previously noted, the council is the governing body of the tribe.

[7]Approximately 90 percent of the funds held in trust by the U.S. Government for the benefit of the tribe were generated from "trust resources." The remaining 10 percent of tribal funds results from interest earned on various moneys deposited with and invested by the Bureau of Indian Affairs. Approximately 83 percent of all tribal income is directly attributable to sales of timber located on tribal land held in trust for the benefit of the tribe by the U.S. Government.

ARTICLE IV. In consideration of the above cession, the United States agree to pay to the said confederated tribes and bands of Indians, in addition to the goods and provisions distributed to them at the time of signing this treaty, the sum of two hundred thousand dollars, in the following manner, that is to say: sixty thousand, to be expended under the direction of the President of the United States, the first year after the ratification of this treaty, in providing for their removal to the reservation, breaking up and fencing farms, building houses for them, supplying them with provisions and suitable outfit, and for such other objects as he may deem necessary, and the remainder in annuities, as follows: for the first five years after the ratification of the treaty, ten thousand dollars each year, commencing September first, 1856; for the next five years, eight thousand dollars each year; for the next five years, six thousand dollars per year; and for the next five years, four thousand per year.

All which sums of money shall be applied to the use and benefit of said Indians, under the direction of the President of the United States, who may from time to time determine, at his discretion, upon what beneficial objects to expend the same for them. And the superintendent of Indian affairs, or other proper officer, shall each year inform the President of the wishes of the Indians in relation thereto.

ARTICLE V. The United States further agree to establish at suitable points within said reservation, within one year after the ratification hereof, two schools, erecting the necessary buildings, keeping them in repair, and providing them with furniture, books, and stationery, one of which shall be an agricultural and industrial school, to be located at the agency, and to be free to the children of the said confederated tribes and bands of Indians, and to employ one superintendent of teaching and two teachers; to build two blacksmiths' shops, to one of which shall be attached a tin shop, and to the other a gunsmith's shop; one carpenter's shop, one wagon and ploughmaker's shop, and to keep the same in repair and furnished with the necessary tools; to employ one superintendent of farming and two farmers, two blacksmiths, one tinner, one gunsmith, one carpenter, one wagon and ploughmaker, for the instruction of the Indians in trades and to assist them in the same; to erect one saw-mill and one flouring-mill, keeping the same in repair and furnished with the necessary tools and fixtures; to erect a hospital, keeping the same in repair and provided with the necessary medicines and furniture, and to employ a physician; and to erect, keep in repair, and provided with the necessary furniture, the buildings required for the accommodation of the said employees. The said buildings and establishments to be maintained and kept in repair as aforesaid, and the employees to be kept in service for the period of twenty years.

And in view of the fact that the head chief of the said confederated tribes and bands of Indians is expected, and will be called upon, to perform many services of a public character, occupying much of his time, the United States further agrees to pay to the said confederated tribes and bands of Indians five hundred dollars per year, for the term of twenty years after the ratification hereof, as a salary for such person as the said (954) confederated tribes and bands of Indians may select to be their head chief; to build for him at a suitable point on the reservation a comfortable house and properly

furnish the same, and to plough and fence ten acres of land. The said salary to be paid to, and the same house to be occupied by, such head chief so long as he may continue to hold that office.

And it is distinctly understood and agreed that * * * all the expenditures and expenses contemplated in this article of this treaty shall be defrayed by the United States, and shall not be deducted from the annuities agreed to be paid to said confederated tribes and bands of Indians. Nor shall the cost of transporting the goods for the annuity payments be charged upon the annuities, but shall be defrayed by the United States.

*     *     *     *     *     *     *

ARTICLE VII. The annuities of the aforesaid confederated tribes and bands of Indians shall not be taken to pay the debts of individuals.

Respondent determined that both the smokeshop income and the per diem payments received by petitioner were income taxable to him.

## OPINION

Sections 1 and 61 of the Internal Revenue Code of 1954 broadly provide that the income of every individual, from whatever source derived, is subject to the Federal income tax. The parties agree that the income of Indians, as well as other individuals, is taxable "unless an exemption from taxation can be found in the language of a Treaty or Act of Congress." *Commissioner v. Walker*, 326 F.2d 261, 263 (9th Cir. 1964), affg. in part and revg. in part 37 T.C. 962 (1962), and cases there cited; *Jourdain v. Commissioner*, 71 T.C. 980, 987 (1979), affd. per curiam 617 F.2d 507 (8th Cir. 1980). Petitioner's primary contention is that certain language in the treaty should be construed to confer an income tax exemption for the smokeshop income and per diem payments that he received during 1975 and 1976.

It is true, as petitioner points out, that ambiguous language in a treaty or statute is to be construed in favor of Indians. See, e.g., *Squire v. Capoeman*, 351 U.S. 1, 6–7 (1956). This principle "comes into play," however, "only if such statute or treaty contains language which can reasonably be construed to confer income [tax] exemptions." *Holt v. Commissioner*, 364 F.2d 38, 40 (8th Cir. 1966), affg. 44 T.C. 686 (1965). We are not free to create, by implication, a tax exemption for petitioner. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156 (1973); *Fry v. United States*, 557 F.2d 646, 649 (9th Cir. 1977); *Jourdain v. Commissioner, supra* at 990. Thus, we can hold for the

petitioner only if we can find "express exemptive language in some statute or treaty." *United States v. Anderson*, 625 F.2d 910, 913 (9th Cir. 1980).

### 1. Smokeshop Income

With respect to the smokeshop income, petitioner emphasizes the provision in article II of the treaty stating that the reservation shall be set apart for the "exclusive use and benefit" of the tribe. Petitioner argues that this language exempts income received by members of the tribe "as a result of the use of reservation land and resources." He contends that the smokeshop business, conducted on reservation land and regulated by the council, was "merged with and indistinguishable from the reservation thereby being for the exclusive use and benefit of the Yakima Nation." Petitioner argues that, therefore, the smokeshop income must be held to be tax exempt "because to tax such income would benefit persons other than the Yakima Nation membership."

The treaty nowhere expressly deals with the question of taxation of the tribe or its members. Although the general language relied upon by petitioner can be read as a limitation on State authority to tax income generated on the reservation (see *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 174–175 (1973)), we do not think it can be read to exempt the income of a member of the tribe from Federal taxation. See *United States v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980), noting that general treaty language such as that devoting land to a tribe's "exclusive use" is not sufficient to exempt Indians from Federal laws of general applicability. In any event, even if we assume that the "exclusive use and benefit" language in article II of the treaty exempts income derived by the tribe or its members from the direct use of reservation land and resources, we think it clear that such language does not exempt the smokeshop income from taxation.

In *Squire v. Capoeman, supra*, which also involved an Indian taxpayer, the Supreme Court found an exemption from Federal income taxation in the General Allotment Act of 1887 (see note 3 *supra*). The act provided that allotted land was to be held in trust by the United States for the "sole use and benefit" of the Indian allottee, subject to a promise to convey the fee interest to the allottee at the end of the trust "free of

all charge or incumbrance whatsoever." 25 U.S.C. sec. 348. Finding a congressional intent to exempt allotted land from all taxes until the fee interest was transferred to the allottee (351 U.S. at 8), the Supreme Court held that income derived directly from the land was exempt from tax. Specifically, it held that the Federal income tax did not apply to income received by noncompetent Quinaielt Indians from the sale of standing timber on lands allotted to them from the Quinaielt Reservation, although it did apply to "reinvestment income." *Squire v. Capoeman, supra* at 9–10.

Based on the "derived-directly-from-the-land" standard enunciated in *Squire v. Capoeman, supra* at 9, the courts have held income not derived directly from reservation lands to be taxable by the Federal Government. For example, in *Fry v. United States, supra* at 648, the court held that income received by a noncompetent Indian subcontractor of a non-Indian concern which had contracted to cut timber from a tribe's unallotted reservation land was taxable. Similarly, in *Critzer v. United States*, 220 Ct. Cl. 43, 597 F.2d 708 (1979), the Court of Claims held that income derived by an enrolled member of a tribe from the operation of a motel, restaurant, and gift shop located on tax-exempt tribal lands pursuant to a permit granted by the tribe did not meet the "directly-from-the-land" standard and was taxable. While these and other similar cases are based principally on the *Squire v. Capoeman, supra*, application of the General Allotment Act of 1887, they support the conclusion that taxing petitioner's smokeshop income does not violate any exemption which may arguably exist with respect to the use of reservation land and resources by virtue of the treaty provision stating that the reservation shall be set apart for the "exclusive use and benefit" of the tribe.

It may be true, as petitioner argues, that his smokeshop would not have existed during 1975 and 1976 but for its location on reservation land.[8] In this limited sense, petitioner's

---

[8]The profitability of the smokeshops licensed by the council was to a large extent dependent upon a claimed tribal exemption from State cigarette and sales taxes. During the years in question, smokeshop operators did not collect such taxes from the purchasers of cigarettes and other tobacco products, and a large majority of their sales were to non-Indians who traveled to the reservation to take advantage of the bargain prices. See *Washington v. Confederated Tribes*, 447 U.S. 134, 145, 155 (1980). The Supreme Court

smokeshop business can be characterized, as he suggests, as "inseparable from and a part of" the reservation. However, petitioner did not receive the smokeshop income principally "as a result of the use of reservation land and resources." The mere fact that petitioner's business was located on reservation land is not determinative. The income was earned primarily through a combination of petitioner's labor, the sale of tobacco products (none of which were grown on reservation land, so far as it appears from the record), and the marketing of a claimed exemption from State taxes.[9] In these circumstances, imposition of the income tax on petitioner's smokeshop income is not inconsistent with article II of the treaty; any exemption with respect to "reservation land and resources" would not extend to income only incidentally and not directly attributable to such land and resources. Compare *Critzer v. United States*, 220 Ct. Cl. at ____ , 597 F.2d at 711–715; *Fry v. United States, supra* at 648. See also *United States v. Anderson, supra* at 913 n. 3 ("A noncompetent Indian's income from 'non-land-based' businesses * * * is taxable."). We hold that petitioner is taxable on the smokeshop income.[10]

## 2. Per Diem Payments

We also think it clear that the per diem payments received by petitioner in 1976 for services performed as a member of the council are not exempt from Federal income taxation. So far as these payments are concerned, this case is not distinguishable in any material respect from either *Commissioner v. Walker*, 326 F.2d 261 (9th Cir. 1964), affg. in part and revg. in part 37 T.C. 962 (1962), or *Jourdain v. Commissioner*, 71 T.C. 980 (1979), affd. per curiam 617 F.2d 507 (8th Cir. 1980).

In both *Walker* and *Jourdain*, the question presented for

---

subsequently held that the State of Washington could impose its sales and cigarette taxes on purchases at tribal smokeshops by nonmembers of the tribe. *Washington v. Confederated Tribes, supra.*

[9]See note 8 *supra.*

[10]We have considered an alternative argument made by petitioner concerning his claimed exemption for the smokeshop income and find it to be without merit. Even if the treaty does provide an exemption from taxation with respect to the person for whom Allotment No. Odd Tract No. 5076 is held in trust, such an exemption would not apply to petitioner as lessee of the land. See *United States v. Anderson*, 625 F.2d 910 (9th Cir. 1980); *Holt v. Commissioner*, 364 F.2d 38 (8th Cir. 1966), affg. 44 T.C. 686 (1965); *Wynecoop v. Commissioner*, 76 T.C. 101 (1981).

decision was whether a noncompetent Indian was taxable on amounts received for services performed as a member of a tribal council. In both cases, as in the case presently before us, the amounts received had their origin in funds which were held in trust by the Government and which were derived for the most part directly from tribal lands held in trust by the Government for the benefit of the respective tribes. No statute or treaty exempted the income in question in *Walker* or *Jourdain*, and the noncompetent Indians in those cases were held taxable on amounts received for services performed as members of tribal councils. Similarly, we have found no lanuage in the treaty or in any statute that would exempt the per diem payments received by petitioner.

Petitioner argues that *Jourdain* and *Walker* are distinguishable and, in this connection, points to several provisions of the treaty which he believes do grant an exemption for the per diem payments. First, he focuses on the second paragraph of article V of the treaty[11] in which the United States agreed to pay the tribe $500 per year for 20 years[12] as a salary for its head chief in recognition of the fact that he would be called upon to perform many services of a public character. Second, he emphasizes article VII which provides that annuities paid by the United States to the tribe (under article IV) "shall not be taken to pay the debts of individuals." As an aid to construing the meaning of these provisions, petitioner points to statements in the treaty minutes made by the negotiator for the United States to the effect that the salary of the head chief would be "secured to him" at the time that the tribe moved to the reservation. In this connection, petitioner analogizes members of the council to tribal chiefs, and he has gone to great lengths to show that treaty negotiators were aware that "tribal chiefs traditionally and by custom were entitled to an extra degree of wealth or property distribution" vis-a-vis other members of the tribe.

Petitioner contends that, when interpreted in light of the fact that "extra distributions" of tribal wealth to chiefs were contemplated by treaty negotiators, the language he relies

---

[11]All pertinent provisions of the treaty are quoted in our findings of fact, *supra*.

[12]The 20-year period commenced upon ratification of the treaty in 1859.

upon in articles V and VII of the treaty "can reasonably be read to imply an income tax exemption" for payments to tribal chiefs, including per diem payments to council members. However, as previously noted, we are not free to grant an income tax exemption to petitioner by implication. Furthermore, in our view, the language relied upon by petitioner is completely unambiguous; it has nothing to do with taxation on its face and is simply not broad enough to include an exemption from tax for the per diem payments. Compare *Squire v. Capoeman*, 351 U.S. at 6–7.

Petitioner also relies upon the "exclusive use and benefit" language in article II of the treaty, previously discussed in connection with the smokeshop income, in arguing that the per diem payments are tax exempt. His position is that, in order to have the exclusive use and benefit of the reservation, individual members of the tribe may not be subjected to taxation on any amounts having their origin in revenues derived by the tribe as a whole directly from reservation lands.[13] We think this argument is precluded by *Jourdain* and *Walker*, where the amounts held taxable as payments for services originated in funds derived directly from tribal lands and held in trust for the "use and benefit" of the concerned tribes.

Finally, petitioner relies upon 25 U.S.C. sec. 407, which provides that proceeds from the sale of timber from unallotted (i.e., tribal) reservation lands "shall be used for the benefit of the Indians who are members of the tribe or tribes concerned" in such manner as the Secretary of the Interior (the Secretary) may direct. Petitioner points out that his per diem payments were made from tribal funds of which 83 percent were proceeds from sales of such timber. He further points out that the Secretary (through the Bureau of Indian Affairs) approved the budget resolution of the council, and thus, the per diem payments to petitioner, for 1976. In light of those facts, petitioner argues that the per diem payments should be held to be exempt from tax because an income tax "on tribal

---

[13]See note 7 and the accompanying text, *supra.*

members [such as petitioner] who received distributions of timber sale proceeds as directed by the Secretary would benefit persons who are not members of the Yakima Nation in violation of the statute [25 U.S.C. sec. 407]."

The statutory provision relied upon by petitioner does not purport to deal with the question of taxation. Even if we assume that timber sales proceeds would be exempt from tax under 25 U.S.C. sec. 407 while held by the Secretary and upon initial distribution for the benefit of members of the tribe, we nonetheless think it clear that the per diem payments to petitioner are not exempt. Petitioner did not, as he suggests, receive a distribution of timber sale proceeds; such proceeds were distributed to the tribe, and petitioner was paid by it for services rendered. We do not think that any exemption which may apply to a distribution of timber sales proceeds can be viewed as applying to a subsequent recipient of payments for services rendered simply because he is a member of the tribe and a portion of such payments can be traced to the timber sales proceeds. See *Fry v. United States*, 557 F.2d 646, 648 (9th Cir. 1977); *Commissioner v. Walker*, 326 F.2d at 264; *Paul v. Commissioner*, 77 T.C. 755, 764–765 (1981), on appeal (9th Cir., Dec. 28, 1981); *Jourdain v. Commissioner*, 71 T.C. at 986. We hold that the per diem payments are includable in petitioner's taxable income.

To reflect the foregoing,

> *Decision will be entered for the respondent in docket No. 7095–79.*
>
> *Decision will be entered for the petitioner in docket No. 7096–79.*
>
> *Decision will be entered under Rule 155 in docket No. 7097–79.*