T.C. Memo. 2000-11

UNITED STATES TAX COURT

JOHN W. MARSH, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27202-96.          Filed January 11, 2000.

<u>Stephen P. Pingree</u> and <u>Richard P. McClellan III</u>, for
petitioner.

<u>Henry E. O'Neill</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes and additions to tax as
follows:

| | | Additions to Tax | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651 (a)(1) | Sec. 6651(f) | Sec. 6653 (b)(1)(A) | Sec. 6653 (b)(1) | Sec. 6653 (b)(1)(B) | Sec. 6654 |
| 1986 | $54,593 | --- | --- | $40,945 | --- | [1]--- | --- |
| 1987 | 73,676 | --- | --- | 55,257 | --- | [2]--- | $2,791 |
| 1988 | 85,992 | --- | --- | --- | $64,494 | --- | 5,158 |
| 1989 | 132,429 | --- | $94,988 | --- | --- | --- | 8,522 |
| 1990 | 40,064 | $8,650 | --- | --- | --- | --- | 2,238 |
| 1991 | 14,052 | 1,961 | --- | --- | --- | --- | 412 |
| 1992 | 91,232 | 21,592 | --- | --- | --- | --- | 3,427 |
| 1993 | 20,040 | 4,896 | --- | --- | --- | --- | 818 |
| 1994 | 3,515 | 879 | --- | --- | --- | --- | 182 |
| 1995 | 3,371 | 843 | --- | --- | --- | --- | 186 |

[1]50 percent of the interest due on $49,421.
[2]50 percent of the interest due on $68,449.

If we do not sustain respondent's determination of additions to tax for fraud pursuant to sections 6653(b)[1] and 6651(f) for the years 1986 through 1989, respondent alternatively determined the following additions to tax for negligence or intentional disregard of rules and regulations (section 6653), and failure to file within the time prescribed by law (section 6651):

| | Additions to tax | | |
|---|---|---|---|
| Year | Sec. 6651 (a)(1) | Sec. 6653 (a)(1)(A) | Sec. 6653 (a)(1) |
| 1986 | $12,355 | $2,730 | --- |
| 1987 | 17,112 | 3,684 | --- |
| 1988 | 20,296 | --- | $4,300 |
| 1989 | 31,663 | --- | --- |

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether petitioner, a resident of Hawaii and descendant of indigenous Hawaiians, is subject to Federal income tax on income derived from sources within the United States; (2) whether $105,000 received by petitioner in 1989 from an uninsured motorist claim constitutes taxable income to petitioner or is excluded under section 104(a); (3) whether petitioner is liable for additions to tax for fraud in the years 1986 through 1988 and fraudulent failure to file for 1989, and if not, whether petitioner is liable for alternative additions to tax; and (4) whether petitioner is liable for additions to tax for failure to make estimated tax payments for the years 1987 through 1995.

                        FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Pearl City, Oahu, Hawaii. Petitioner was born on March 20, 1944, in Hawaii. Petitioner graduated from high school in 1962. From 1965 until 1992, petitioner was employed as a police officer by the Honolulu Police Department. When he retired in 1992, he held the rank of sergeant. Petitioner resided in the United States, and all his income was derived from sources within the United States during the years in issue. During the years 1986 through 1989, petitioner received the following amounts of income from the described sources:

|                              | 1986     | 1987     | 1988     | 1989     |
|------------------------------|----------|----------|----------|----------|
| Wages (HPD)                  | $41,004  | $45,605  | $44,315  | $49,495  |
| Non-employee compensation    | 364      | 1,000    | -0-      | -0-      |
| Interest                     | 425      | 539      | 349      | 455      |
| Dividends                    | 226      | -0-      | -0-      | -0-      |
| State income tax refund      | 1,719    | -0-      | -0-      | -0-      |
| Pension annuity              | -0-      | 61       | -0-      | -0-      |
| Gambling winnings (Horseshoe Casino) | -0- | 1,600 | -0-    | -0-      |
| Cash deposits                | 9,300    | 5,000    | 8,500    | -0-      |

Beginning in 1977, petitioner also operated a sole proprietorship masonry contracting business under the name S&H Masonry. Petitioner operated this business through at least 1993. For the years 1986 through 1989, petitioner received the following amounts and incurred the following expenses in connection with the operation of S&H Masonry:

|                            | 1986      | 1987      | 1988      | 1989      |
|----------------------------|-----------|-----------|-----------|-----------|
| Gross receipts             | $110,632  | $268,309  | $312,446  | $380,315  |
| Wages (per statutory notice) | (43,664) | (127,895) | (85,777) | (91,211)  |
| Additional expenses        | (54,786)  | (65,557)  | (138,779) | (94,466)  |
| Net                        | 12,182    | 74,857    | 87,890    | 194,638   |

Some of the receipts generated by this business were paid to petitioner in cash. Around August of 1989, petitioner stopped using his business checking account in favor of conducting business in cash. Petitioner drew 279 checks against his business account from January to July 1989 (approximately 40 checks per month). From August to September of the same year,

petitioner drew only 29 checks against the business account (approximately 15 checks per month).  This drop in activity was due to the fact that petitioner started paying his employees in cash as of July 21, 1989, rather than by check.

Petitioner received the following amounts of income, as set forth in the notice of deficiency, for the years 1990 through 1995:

| 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|------|------|------|------|------|------|
| $118,651 | $58,296 | $119,633 | $66,839 | $26,978 | $28,883 |

The State of Hawaii imposes a general excise tax on gross receipts, which is required to be collected by the recipient and remitted to the State of Hawaii.  For the years 1986 through 1989, petitioner charged and collected from masonry customers the following amounts of general excise tax:

| 1986 | 1987 | 1988 | 1989 |
|------|------|------|------|
| $947.78 | $808.00 | $4,668.88 | $9,598.13 |

Petitioner did not remit any of the general excise tax he collected to the State of Hawaii during 1986 through 1989.

For the years 1965 through 1985, petitioner filed joint Federal and State of Hawaii income tax returns with his wife. Petitioner has not filed a Federal or State of Hawaii income tax return for any year after 1985.

Petitioner's 1985 return was selected for audit.  Petitioner refused to cooperate with respondent's personnel during the audit

leading respondent to issue a notice of deficiency for the year 1985. The 1985 deficiency was assessed on February 22, 1988. After receiving the bill for the assessment, petitioner retained an Enrolled Agent, Carol Baptista, who requested that respondent grant audit reconsideration. Ms. Baptista discovered that petitioner had not filed income tax returns for 1986 and 1987 and explained to petitioner that he was legally required to file such returns. On March 24, 1989, Ms. Baptista wrote a letter to the District Director, Internal Revenue Service, Honolulu, Hawaii regarding the "Tax Audit and Filing Position of John Marsh." That letter was signed by Ms. Baptista and petitioner and stated:

Re:   Tax Audit and Filing Position of John Marsh

Gentlemen:

This letter is to clarify the compliance and filing position of Mr. John Marsh.

As you are aware, the Internal Revenue Service audited Mr. Marsh for the year 1985. Mr. Marsh was represented by Mike Kailing, who was then, apparently, an enrolled agent. Mr. Marsh is, obviously, not a tax expert, and did not realize that some of Mr. Kailing's positions were, to say the least inappropriate. Mr. Kailing apparently refused to comply with Internal Revenue Service requests, giving rise to a substantial assessment against Mr. Marsh.

Mr. Marsh is now, however, represented by Janell Israel & Associates, and complete information has been presented to support the 1985 return. However, on audit reconsideration, it appears to us that all of the supporting material presented was not taken into consideration, and we cannot get the Internal Revenue Service to provide us with the final report explaining why such a substantial assessment remains. We would like an opportunity to discuss what portions of the

supporting materials have been disallowed. We cannot help but believe that this is caused, at least in part, by a reaction to Mr. Kailing's conduct, which <u>does not</u> reflect either the position or [sic] Janell Israel & Associates or Mr. Marsh.

In addition, Mr. Marsh has failed to file his 1986 and 1987 returns, but the necessary information has been assembled, and we should have the returns prepared in the very near future.

It must be categorically stated that Mr. Marsh is not a "tax protester", and is not willfully failing to file any return or to provide appropriate information to support returns filed. It should not be held against him that he was badly represented by someone else. In fact, he should probably be given the benefit of the doubt as someone who as [sic] badly represented in the past, but is trying to correct the situation. Hopefully we can cooperate on a more positive basis in order to get this situation properly resolved.

Very truly yours,

<u>Carol Baptista</u>

I have read and approved the above letter, and wish to affirm that I am not trying to willfully avoid any lawfull [sic] Internal Revenue requirements.

<u>John Marsh</u>

CC: Russell Bain

Petitioner never provided Ms. Baptista with records from which Ms. Baptista could prepare petitioner's 1986 and 1987 returns. During the course of the audit reconsideration, it was also discovered that petitioner had not withheld any employment taxes, not filed any employment tax returns, and not issued any Forms W-2 or 1099 with respect to amounts paid to workers for S&H Masonry. Petitioner's Enrolled Agent advised petitioner that he was required to report to respondent on either Form 1099 or W-2

the amounts of compensation he paid to his masonry workers. One such worker was subsequently convicted for subscribing false income tax returns under section 7206(1) for 1985, 1986, and 1987 for failing to report income earned as a mason, including more than $62,000 paid by petitioner.

Petitioner was indicted under section 7201, Attempt to Evade or Defeat Tax, for the years 1987 through 1989. After a jury trial in 1995, petitioner was acquitted on all three counts.

Sometime between 1975-77, petitioner purchased a male Arabian horse named Sunset Wailea. Petitioner's 1981 Federal income tax return included a Schedule C that listed petitioner's business activities as "contracting, farrier, horse breeding" under the business names of "S&H Masonry" and "Keone's Horse shoeing and Breeding". Petitioner's 1985 Federal income tax return claimed expenses from "Keone's Ranch Supplies."

On April 9, 1988, petitioner broke his left ankle as the result of an accident. He was initially treated on that same day at Wahiawa General Hospital. The following day he underwent surgery at Straub Clinic. The medical records from Wahiawa General Hospital indicate that petitioner stated the cause of the injury was a "horse fell down on him". Petitioner told the doctors at Wahiawa General Hospital that his injury resulted from a horse falling on him. The medical records from Straub Clinic also state the cause of the injury to be "struck accidentally by

falling object (horse)", and describe petitioner as "police officer who injured his left ankle when a horse fell on him".

Petitioner consulted an attorney sometime after the April 9, 1988 injury. Petitioner then submitted a motor vehicle accident report to the police on April 24, 1988. That report stated petitioner "was involved in a M/C [motorcycle] accident in Kahuku 4-9-88 * * * trying to avoid potential collision [with oncoming unidentified truck] he then lost control of motorcycle flipping off of m/c injuring left ankle." Under Hawaii law, the driver of a motor vehicle which is in any manner involved in an accident in which a person is injured is required to make a report of an accident not more than 24 hours after the accident. Petitioner, a police officer, did not file a timely accident report as required by law. Petitioner's accident report was filed more than 2 weeks after his injury.

Petitioner thereafter, through his attorney, submitted an uninsured motorist claim to his automobile insurance company. The claim asserted that the cause of petitioner's injuries was the motorcycle accident described in the police report. The insurer initially denied the claim. In response to petitioner's claim, the insurer wrote:

> Please be advised that under Mr. Marsh's personal automobile policy with The Travelers, your claim for uninsured motorist coverage is not applicable in this situation. Mr. Marsh's personal automobile policy does not afford coverage for bodily injury suffered by an insured while occupying a highway vehicle, which is

owned by the insured but is not insured for uninsured
motorist coverage.

Based on the above information, Mr. Marsh's claim for
uninsured motorist coverage under his personal
automobile policy is not applicable * * *

The Hawaii Supreme Court had held in 1977 that the exclusion

relied on by the insurer was invalid in the case of Kau v. State

Farm Mut. Auto Ins., 564 P.2d 433 (Haw. 1977).

On March 29, 1989, petitioner commenced a lawsuit against

the insurance company for its failure to pay the above-mentioned

claim. The Civil Information Sheet attached to the Complaint,

signed by the attorney of record, lists the nature of the suit as

"contract" (not motor vehicle tort or other nonvehicle tort).

The Complaint also alleges that:

<u>COUNT I</u>

\*    \*    \*    \*    \*    \*    \*

8.   Defendant TRAVELERS has breached the Implied
Covenant of Good Faith and Fair Dealing under the
policy by refusing or denying or failing to process or
failing to pay Plaintiff's claim without a reasonable
basis for such conduct and with knowledge and reckless
disregard or the lack of a reasonable basis for such
conduct in that Plaintiff has submitted claims under
the provisions of the policy, and Defendant TRAVELERS
refused to process or pay with knowledge that the
exclusion in Defendant's policy of insurance is
prohibited under the laws of Hawaii and that Defendant
TRAVELERS has no colorable defense to payment of
uninsured motorist benefits.

<u>COUNT II</u>

\*    \*    \*    \*    \*    \*    \*

13. The aforesaid outrageous conduct by Defendant TRAVELERS was done intentionally for the purpose of depriving Plaintiff of money due him and to inflict upon him severe emotional distress.

* * * * * * *

## COUNT III

* * * * * * *

16. In its refusal to pay uninsured motorist benefits to Plaintiff, Defendant TRAVELERS has violated public policy as well as Hawaii Revised Statutes Chapter 431-13 which states that no insurer doing business in this State shall engage in unfair claim settlement practices.

## COUNT IV

* * * * * * *

18. Hawaii Revised Statutes Section 480-2 provides that unfair methods of competition, and unfair and deceptive acts or practices in the conduct of any trade or commerce are unlawful.

19. Defendant's failure to pay Plaintiff the uninsured motorist benefits to which he was entitled, or to provide legally sufficient reasons for denying payment, was an unfair practice as set forth in Hawaii Revised Statutes Section 431:13-103(a)(1)(A) and Section 480-2, entitling Plaintiff to an award of general and special damages.

* * * * * * *

## COUNT V

* * * * * * *

25. At the time of issuance of the policy described above, the promises to pay such benefits to Plaintiff were made by Defendant TRAVELERS INSURANCE, * * *, with no intention of performing them or interpreting in good faith such terms and provisions. Defendant and each of them knew such promises and representations were false and were made with the

intent and purpose to deceive Plaintiff and to induce Plaintiff to purchase and accept the insurance policy. Defendant and each * * * knew that Plaintiff believed such provisions to be true and the Plaintiff would and did justifiably rely on such promises and buying the insurance policy and paying the premiums thereon. Nevertheless, Defendant and its agents, employees, authorized representatives or assigns and each of them concealed such true intent from Plaintiff.

* * * * * * *

27. In acting fraudulently and deceitfully as set forth herein, Defendants and each of them intended to and did vex, annoy, and injure Plaintiff.

Petitioner's attorney made the insurer's attorney aware of the Kau v. State Farm Mut. Ins. Co., supra, and served an extensive discovery request seeking the identities of all persons in Hawaii to whom Travelers had denied claims based on the exclusion and raised the prospect of expanding petitioner's lawsuit into a class action suit. Compliance with the discovery request would have required the insurer to expend thousands of hours of manual labor. The insurance company eventually agreed to settle the lawsuit for the maximum amount payable under the policy, $105,000. The Release and Indemnity Agreement stated in pertinent part:

RELEASE AND INDEMNITY AGREEMENT

[B]y these presents does release, acquit and forever discharge, the said RELEASEE * * * from and on account of any and all claims, actions, causes of action, liability or liabilities, demands or damages of whatever name or nature, including any and all claims for general, special, punitive or treble damages, for insurance benefits of whatever name or nature, for past and future earnings loss, for past and future medical

expenses, for attorneys fees, costs, or interest, for loss of services, for loss of support, for loss of association, companionship, love and affection, and for any and all other additional losses incident to the relationships of husband and wife or parent and child, whether at law or in equity, in any manner arisen, arising or to grow out of the following:

1) an automobile accident * * * more specifically described in that certain Honolulu Police Department Motor Vehicle Accident Report No. C-30064;
2) the conduct, acts, or failures to act, or refusals to act on the part of RELEASEE, * * * in connection with the investigation, claim handling, or settlement of any claim arising out of or in connection with said Accident;
3) any alleged neglect or refusal by RELEASEE to pay any benefit or recognize any obligation under any policy of insurance issued to any party and arising out of said Accident;
4) the conduct, acts, or failures to act, neglect, or refusals to act on the part of RELEASEE, or any of its employees, agents, officers, directors, predecessor or successor entities, or their respective attorneys, in connection with the writing, amendment, revision, issuance, promulgation, sale, and/or marketing of any policy of insurance;

any of which said Accident, conduct, acts, failures or refusals to act, or neglect may have resulted in injuries or damages to RELEASOR, as more specifically set forth in that certain lawsuit in the United States District Court for the District of Hawaii, and entitled <u>John Marsh v. Travelers Insurance Company, et al.</u>, Civil No. 89-00262-HMF.

After payment of attorney's fees and costs, petitioner's share of the settlement proceeds amounted to $68,102.70. Petitioner negotiated the settlement check for cash on December 15, 1989. No portion of the settlement proceeds was deposited into any bank account maintained by petitioner. Respondent's notice of

deficiency for 1989 included as an item of income $105,000, which represented the settlement amount.

OPINION

1. Liability for Federal Income Tax

Petitioner argues that he has nationality in the "Nation of Hawai'i" by virtue of his Hawaiian ancestors who were nationals of Hawai'i. Petitioner further argues:

> the United States' annexation of the Nation of Hawaii was based upon illegal acts. * * * was legally invalid under the Constitution of the United States. Therefore, the United States of America and its agency, the Internal Revenue Service, lack jurisdiction over the petitioner and lack legal standing to assess U.S. Taxes against the petitioner.

Petitioner places particular reliance on a 1993 Joint Resolution of Congress, Pub. L. 103-150, 107 Stat. 1510, titled "Overthrow of Hawaii". That resolution provides, inter alia, that [Congress] "acknowledges the historical significance of * * * [the illegal overthrow of the Kingdom of Hawaii in 1893] which resulted in the suppression of the inherent sovereignty of the Native Hawaiian people". Pub. L. 103-150, sec. 1, 107 Stat. 1513 (1993). Petitioner urges us to find that the United States lacks legal standing to assess taxes on his income because he is a descendant from native Hawaiians.

Petitioner resided in the United States and by virtue of his birth in the United States Territory of Hawaii in 1944, "petitioner is a United States Citizen". See 8 U.S.C. sec. 1405

(1994). The Internal Revenue Code taxes the income of all individuals; only nonresident aliens are excluded.[2] See sec. 1. However wrongful the 1893 overthrow of the Kingdom of Hawaii may have been, we can provide no relief to petitioner from the lawful application of the general law of the United States, including the Internal Revenue Code. Similarly based arguments with respect to native American Indians have been rejected by the Supreme Court. Johnson v. M'Intosh, 21 U.S. 543, 588 (1823). We see no reason for elevating petitioner's claim above that of native American Indians. The Supreme Court has more recently stated: "Indians are citizens and that in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of T income taxes as are other citizens." Squire v. Capoeman, 351 U.S. 1, 6 (1956). The Joint Resolution relied on by petitioner specifically provides: "Nothing in this Joint Resolution is intended to serve as a settlement of any claims against the United States." Pub. L. 103-150, sec. 3, 107 Stat. 1514 (1993). The Joint Resolution is neither a treaty nor remedial legislation. Congress has not seen fit to exempt citizens or residents of the United States from the imposition of income tax on the basis of unlawful acquisition of the native land of their ancestors by the United States. If such relief is

---

[2]Sec. 2(d) provides in the case of a nonresident alien individual the taxes imposed by secs. 1 and 55 shall apply only as provided by sec. 871 or 877.

to be given, it must come from Congress.  We therefore hold that petitioner was subject to tax under the Internal Revenue Code for the years in issue.

2.  Accident:  Section 104(a)

In the notice of deficiency for 1989, respondent determined that petitioner received unreported income of $105,000.  The explanation of the adjustment states:

> It is determined that you received insurance proceeds in the amount of $105,000 from * * * Insurance Company for tax year 1989.  This amount is determined to be taxable to you because you have failed to establish that this amount is excludable from gross income under the provisions of the Internal Revenue Code.

It is undisputed that petitioner suffered a broken ankle, made an uninsured motorist claim on his insurance carrier, the claim was not paid on demand, a lawsuit followed, and the insurance company chose to settle and pay the full amount payable under the policy.  Respondent argues that petitioner's uninsured motorist claim was based on a false motor vehicle report.  Respondent contends "insurance proceeds obtained under false pretenses constitute ordinary income to the recipient".

It is not clear from petitioner's pleadings whether he seeks to exclude the insurance settlement under sec. 104(a)(2) or (3).  The original petition does not raise the matter and paragraph 5 of the amended petition states only:  "This money was a tax exempt personal injury settlement received by petitioner from an insurance company."  Petitioner's brief fails to identify the

basis on which petitioner claims the insurance proceeds should be
excluded from petitioner's income.[3]

Section 104(a)(2) excludes from gross income the amount of
damages received on account of personal injuries or sickness.
The term "damages received (whether by suit or agreement)" means
an amount received (other than workmen's compensation) through
prosecution of a legal suit or action based upon tort type
rights, or through a settlement agreement entered into in lieu of
such prosecution.  See sec. 1.104-1(c), Income Tax Regs.  To
exclude damages from gross income pursuant to section 104(a)(2),

---

[3] Respondent's brief assumes that petitioner seeks to exclude the insurance settlement under sec. 104(a)(3).  Sec. 104(a)(2) and (3) provides:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--

\* \* \* \* \* \* \*

(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

(3) amounts received through accident or health insurance for personal injuries or sickness (other than amounts received by an employee, to the extent such amounts (A) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (B) are paid by the employer);

the taxpayer must prove: (1) The underlying cause of action is based upon tort or tort type rights, and (2) the damages were received on account of personal injuries. See Commissioner v. Schleier, 515 U.S. 323, 336 (1995).

Subject to an exception not relevant here, section 104(a)(3) provides an exclusion from gross income of "amounts received through accident or health insurance for personal injuries or sickness". (Emphasis added.) The mere fact that amounts in question are paid by an insurance company under an insurance policy does not establish that such amounts were actually paid for injuries and sickness. The taxpayer has the burden of proving this.

Petitioner's auto insurance, regarding uninsured drivers, apparently does not cover a nonvehicular accident that occurred while the insured was riding his horse. Petitioner sought medical help immediately after breaking his ankle. At that time he informed hospital personnel that a horse had fallen on him. When he was treated the next day he conveyed the same account to the medical service providers. Petitioner was also a career policeman who would understand the need to file a police report immediately if he had been injured as a result of actions by an uninsured motorist who had fled the scene of the accident. Nevertheless, no such report was immediately filed. Indeed, it was not until several weeks had lapsed, after petitioner had a

conversation with his attorney, that he filed a belated police report claiming that an unidentified motorist had caused his injury while petitioner was riding a motorcycle. After filing the police report petitioner filed a claim with his insurance company.

We do not find petitioner's testimony at trial concerning the cause of the accident to be credible. While petitioner admitted telling hospital personnel on the day of the accident that a horse had fallen on him, he failed to give any explanation for the inconsistency between that and his subsequent police report and insurance claim. The police report was not filed until after he consulted with his attorney. In contrast, his statements to attending physicians immediately after the accident that the injury was caused by a horse accident, in circumstances that inherently call for truthfulness, are credible.

The Release and Indemnity executed by the insurer and petitioner does not apportion the settlement amount among the various claims made by petitioner in his complaint. The attorney who acted for the insurance company testified the settlement was in response to "a demand for policy limits and we paid it." He further testified:

> Q: * * * after this entire case was settled, you had satisfied yourself on behalf of the [insurance] company that Mr. Marsh was not committing any type of insurance fraud against [the insurance company], correct?

A:  No, we had not  - it was not quite that simple.  It was basically that the fact that the issue of whether or not it was a motorcycle versus a horse accident was not conclusively established.  We had not had the opportunity to fully develop those issues.  But looming on the horizon was [Mr. Marsh's attorney's] threat of expanding the lawsuit, plus this very onerous discovery request ["that would require hundreds of thousands of hours of manual labor" to comply with] that had been served on us.  And you know, we felt that we were kind of pushed against the wall basically.

Q:  * * * if Mr. Marsh was lying about the cause of the accident and it was a non-vehicular accident, the insurance company would have had a defense to paying out any claims under the policy, correct?

A:  Yes it would have had a defense to the claim under the policy, but not to the other claims.

The insurance settlement in this case was paid by the insurer to avoid the costs of litigating what it considered to be a doubtful personal injury claim after the insurance company had initially and improperly relied on an invalid exclusionary provision.  Petitioner's claim was actually based on a false accident report, and this false statement was the basis for his recovery.  Without petitioner's false statement regarding the circumstances of the accident there would have been no insurance recovery.  Statutory exclusions from income such as those contained in section 104(a) are to be narrowly construed.  See Commissioner v. Jacobson, 336 U.S. 28 (1949).  We hold that the $105,000 settlement was not on account of or for personal injuries within the meaning of section 104(a).  We, therefore,

uphold respondent's determination that the amount of $105,000 be included in petitioner's 1989 gross income.[4]

3. Fraud

Respondent determined that petitioner is liable for an addition to tax for fraud for each of the years 1986, 1987, 1988, and 1989. Respondent bears the burden of proof on this issue. See sec. 7454(a); Rule 142(b). In order to discharge the burden, respondent must prove by clear and convincing evidence: (1) An underpayment exists for each year in issue, and (2) some portion of the underpayment for that year is due to fraud. See sec. 7454(a); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

In order to show fraud respondent must show that petitioner intended to evade taxes known to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of taxes. See Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud is intentional wrongdoing on the part of the taxpayer with the specific intent to evade a tax known to be owing. See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Conforte v. Commissioner, 692 F.2d 587, 592 (9th

---

[4]Petitioner has made no claim for deductions of legal fees and costs in the event we were to find the $105,000 includable in gross income; therefore, we express no opinion on the deductibility of these items under the particular facts of this case.

Cir. 1982)(citing <u>Powell v. Granquist</u>, 252 F.2d 56, 60 (9th Cir. 1958)), affg. in part and revg. in part 74 T.C. 1160 (1980).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See <u>Gajewski v. Commissioner</u>, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never imputed or presumed; it must be affirmatively established by the Commissioner. See <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970).

Fraudulent intent is rarely established by direct evidence. As a consequence courts have inferred fraudulent intent from various kinds of circumstantial evidence. See <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Powell v. Granquist</u>, <u>supra</u> at 61. Some of the indicia of fraud include: (1) Understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failure to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, (9) dealing in cash, and (10) failing to make estimated tax payments. See <u>Bradford v. Commissioner</u>, <u>supra</u> at 307-308. Willful failure to file does not in itself establish liability for additions to tax on account of fraud. However, such a failure may be properly considered in connection with other facts in determining whether any deficiency or underpayment of tax is due to fraud. See <u>Stoltzfus v. United States</u>, <u>supra</u>.

Respondent's fraud determinations were made in relation to three separate statutory regimes. For the taxable years 1986 and 1987, the addition to tax for fraud is equal to 75 percent of the portion of any underpayment attributable to fraud, plus 50 percent of the interest due on that portion. See sec. 6653(b)(1)(A) and (B). If respondent establishes that any portion of the underpayment for 1986 or 1987 is attributable to fraud, then the entire underpayment is to be treated as attributable to fraud, except with respect to any portion of the underpayment that petitioner establishes is not attributable to fraud. See sec. 6653(b)(2).

For 1988 the fraud addition to tax was changed by the enactment of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, section 1015(b)(2)(B), 102 Stat. 3369.[5] The

---

[5] The relevant provision provided:

SEC. 6653(b) Fraud.--

> (1) In General.--If any part of any underpayment (as defined in subsection (c)) of the tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

> (2) * * * If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer

(continued...)

statutory regime was again changed in relation to 1989.[6]
Respondent determined that petitioner is liable under the
provision of section 6651(f) in relation to his failure to file
for 1989.  That section, so far as is relevant, provided that if
any failure to file any return is fraudulent the additions to tax
for failure to file provided in section 6651(a) are increased
from 5 percent to 15 percent and from 25 percent to 75 percent
respectively.[7]

There is an underpayment of tax for each of the years in
issue.  Petitioner was aware of his legal obligation to file for
the years preceding the years in issue and did in fact file
returns for years prior to 1986.  Petitioner did not file returns
for 1986, 1987, 1988, and 1989, or any years thereafter.

---

[5](...continued)
establishes is not attributable to fraud.

[6]See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-
239, sec. 7721(c)(1) (deleting Code sec. 6653(b)), and sec.
7741(a) (inserting the new Code sec. 6651(f)).

[7]SEC. 6651(a).  Addition to the Tax.--In case of failure--

(1) to file any return required under authority of
subchapter A of chapter 61 * * * there shall be added to the
amount required to be shown as tax on such return * * * [15]
percent of the amount of such tax if the failure is for not
more than 1 month, with an additional * * * [15] percent for
each additional month or fraction thereof during which such
failure continues, not exceeding * * * [75] percent in the
aggregate; [Sec. 6651(a), (f).  The bracketed percentages
are substituted into sec. 6651(a) pursuant to sec. 6651(f)
in cases where the failure to file is fraudulent.]

Petitioner's failure to file income tax returns for years subsequent to 1985 eventually became the subject of a criminal investigation.

Petitioner has adopted various theories over the years in an attempt to explain his failure to file returns or pay Federal income tax on his substantial income.  Petitioner testified: "From 1986, I just said, I'm not part of your system, and I just did nothing.  I had state taxes taken from my pay, I had federal taxes taken from my pay.  I made no effort to disrupt that.  I just said, 'Hey, I'm not bothering with you guys'."  Petitioner further testified, "Well, I also knew that the law required me, supposedly, to pay taxes, and I took a stand against it back in '86."

Petitioner's testimony is in marked contrast to the representation that he and his Enrolled Agent, Ms. Baptista, made to respondent in the letter, dated March 24, 1989, requesting additional audit reconsideration.  In that letter it was stated:

> Mr. Marsh has failed to file his 1986 and 1987 returns, but the necessary information has been assembled, and we should have the returns prepared in the very near future.

> It must be categorically stated that Mr. Marsh is not a "tax protester", and is not willfully failing to file any return or to provide appropriate information to support returns filed.  It should not be held against him that he was badly represented by someone else.

In response to the criminal investigation, petitioner wrote to respondent on May 29, 1992, stating:

> I HAVE DETERMINED FROM WRITTEN, RELIABLE LEGAL ADVICE FROM TAX PROFESSIONALS AND FURTHER RESEARCH INTO THE LAW, THAT I AM <u>NOT LIABLE</u> OR <u>SUBJECT TO OR FOR</u> ANY TAX UNDER TITLE 26, AND NOTHING I RECEIVE IS SUBJECT TO TAX UNDER SUBTITLE A.  I AM NOT A 'TAXPAYER' AS DEFINED IN SECTION 7701(A)(14)* * *"

The remainder of the letter contains the pseudolegal argument that this Court has had occasion to refer to as tax protester rhetoric and legalistic gibberish.  See, e.g., <u>Kearney v. Commissioner</u>, T.C. Memo. 1999-12.  In September 1992, petitioner was represented by an attorney who wrote respondent, in an effort to avoid the criminal prosecution of his client, and described petitioner as a "naive citizen exposed to 'tax protestor' rhetoric" and further stating:

> When I [petitioner's attorney] took the time to explain in detail the process by which federal appeals courts had rejected each of the positions on which he [petitioner] had relied, Mr. Marsh was shocked, incredulous and mortified.

Neither petitioner's nor his attorney's letters in 1992 attribute petitioner's failure to pay tax or file tax returns to a belief in "Hawaiian Sovereignty".

At a conference in January 1993 with respondent at Honolulu District Council's office, neither petitioner nor his attorney mentioned "Hawaiian Sovereignty" as an explanation for petitioner's noncompliance with the tax laws.

At trial petitioner, a police officer, testified that he did not believe he was required to file in 1986 or subsequent years because filing was "voluntary" and because of his growing belief in "Hawaiian Sovereignty". Petitioner testified his post-1985 beliefs were based on the advice of a "tax accountant", a Mr. Kailing. The record is devoid of corroboration for petitioner's testimony as to his growing belief in "Hawaiian Sovereignty" as a reason for his failure to file tax returns or pay taxes prior to his criminal trial in 1995. Indeed, the representations made by petitioner and his attorney in the record indicate petitioner held no such belief prior to his criminal trial.

We do not find to be credible petitioner's testimony that he failed to file tax returns or pay taxes because he believed the tax system to be voluntary or because of his growing belief in "Hawaiian Sovereignty". Rather, the record clearly and convincingly demonstrates that after petitioner filed his 1985 return in 1986, the alleged reasons that petitioner used to justify his failure to file returns simply shifted from one rationale to another. When it served petitioner's purposes he and his agents made representations to the Internal Revenue Service that he had been misled or misguided. However, after every such instance petitioner reverted to another justification for his continued noncompliance. The only thing that remained

constant was petitioner's objective to dodge his responsibility to pay taxes. Based on the foregoing we believe that petitioner did not have a sincere belief in the reasons he now relies on for not complying with the law.

Other facts support this conclusion. For example, petitioner collected a 4-percent general excise tax from his customers but did not remit the funds so collected to the State of Hawaii. The fact that petitioner collected taxes and did not pay them to the State of Hawaii leads us to believe that his purpose in collecting and retaining these State taxes was to enhance his financial status. There was no high-minded or misguided purpose; petitioner just did not want to pay tax. Petitioner's conduct regarding his State tax obligations supports our conclusion that petitioner's failure to file or pay Federal tax was not motivated by a sincere belief that he was under no legal obligation to do so. In McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), we observed:

> While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax, see Toledano v. Commissioner, 362 F.2d 243, 247 (C.A. 5, 1966), the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to

misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. Rogers v. Commissioner, 111 F.2d 987 (C.A. 6, 1940). The legal relevancy of such evidence is based upon logical principles which go to negate innocent intent. United States v. Bridell, 180 F.Supp. 268 (N.D. Ill. 1960); Pappas v. United States, 216 F.2d 515 (C.A. 10, 1954).

On July 12, 1988, petitioner requested that the State of Hawaii place his specialty masonry contractor's license on "inactive status". Afterward, petitioner continued to operate that business on an unlicenced basis. Petitioner had gross receipts from his masonry business of $318,315 in 1989. Around August of 1989, petitioner stopped using his business checking account in favor of conducting the masonry business using cash. Petitioner started paying his employees in cash as of July 21, 1989, rather than by check. Petitioner received a large insurance settlement and converted the check into cash rather than depositing that amount into a bank account. Petitioner's conduct in operating an unlicenced business and switching to cash transactions is further evidence of petitioner's fraudulent intent.

Petitioner suggests that his failure to file and pay tax for the years 1986 through 1989 was not fraudulent because the Internal Revenue Service was aware of his noncompliance. The fact that petitioner's failure to file returns was known to the IRS does not preclude a finding of fraud. Disclosed defiance,

standing alone, does not bar a finding of fraud. See Edelson v. Commissioner, 829 F.2d 828 (9th Cir. 1987), affg. T.C. Memo. 1986-223. We find that petitioner knew of his obligation to pay tax and intentionally evaded the tax known to be owing by failing to report his income. Consequently, we sustain respondent's determination of the applicability of the fraud additions to tax for each of the years 1986, 1987, 1988, and 1989. For 1986, 1987, and 1988, petitioner has not established any portion of the underpayment is not attributable to fraud.

4. Addition to Tax for Failure To Pay Estimated Tax Under Section 6654 for the Years 1987-95

Respondent determined that petitioner is liable for an addition to tax for failure to pay estimated income tax under section 6654(a) for the years 1987-1995. Unless the taxpayer demonstrates that one of the statutory exceptions applies, imposition of this addition to tax is mandatory where prepayments of tax, either through withholding or by making estimated quarterly tax payments during the course of the taxable year, do not equal the percentage of total liability required under the statute. See sec. 6654(a); Niedringhaus v. Commissioner, 99 T.C. 202, 222 (1992); Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Petitioner bears the burden of proving his entitlement

to any exception.  See <u>Habersham-Bey v. Commissioner</u>, 78 T.C. 304, 319-320 (1982).

Petitioner has not filed returns for the years in issue or made any estimated tax payments for those years, nor has he shown that any of the statutory exceptions are applicable in this case. We, therefore, sustain respondent's determination.

<u>Decision will be entered</u>

<u>under Rule 155</u>.