FILED
United States Court of Appeals
Tenth Circuit

April 6, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN A. BARRETT, JR.; SHERYL S. BARRETT,

      Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

      Defendant-Appellee.

No. 08-6017

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:06-CV-0968-HE)**

---

William H. Whitehill, Jr., of Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, Oklahoma, for Plaintiffs-Appellants.

Marion E. M. Erickson, (Nathan J. Hochman, Assistant Attorney General; Jonathan S. Cohen, Attorney, Tax Division, Department of Justice; John C. Richter, United States Attorney, of counsel, with her on the brief), Attorney, Tax Division, Department of Justice, Washington, D.C., for Defendant-Appellee.

---

Before **BRISCOE, HOLLOWAY,** and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

John A. Barrett, Jr.[1] ("Barrett") filed suit under 28 U.S.C. § 1346(a) against the United States seeking refund of the federal income taxes, penalties, and interest paid by him pursuant to an Internal Revenue Service ("IRS") assessment for the tax year ending December 31, 2001. Barrett timely appeals the district court's grant of summary judgment in favor of the United States. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the district court's ruling that the salary paid to Barrett as chairman of the Citizen Potawatomi Tribe (the "Tribe")[2] was not exempt from federal income tax. We also affirm the district court's ruling on the accuracy-related penalty.

## I

Barrett is a member of the Tribe and has been involved in the Tribe's governance since 1971. In 1985, Barrett was elected chairman of the Tribe at the annual meeting of the Tribe, and he has been re-elected to the chairmanship through to the present time. He held the chairmanship during the 2001 tax year.

The position of tribal chairman is included within the executive branch of the Tribe and encompasses various constitutional duties. The constitutional duties of the chairman include acting as head of the executive branch of the Tribe,

---

[1] Sheryl S. Barrett is also a captioned plaintiff-appellant because she and John Barrett were married in 2001 and filed a joint income tax return. Her identity and activities are not otherwise relevant to Barrett's appeal.

[2] The Citizen Potawatomi Tribe was formerly known as the Citizen Band Potawatomi Indian Tribe and is a federally recognized tribe of American Indians.

general supervision of the daily affairs of the Tribe, seeing that the laws of the Tribe are faithfully enforced, and presiding over meetings of the various governmental bodies of the Tribe. The constitution of the Tribe also provides for a separately elected judicial branch, and a legislative branch called the Business Committee. The Business Committee is comprised of the following elected positions: chairman, vice chairman, secretary/treasurer, and two councilmen. Persons elected to these positions are all elected by the Tribe at its annual meeting. The functions of the Business Committee include developing a budget for the Tribe's funds and appropriating funds for the day-to-day operations of the Tribe. As regards the compensation paid to the chairman of the Tribe, the Business Committee budgets funds and appropriates the compensation to be paid.

In the late 1940s and early 1950s, the Tribe brought various claims against the United States before the Indian Claims Commission. These claims were brought pursuant to the Indian Claims Commission Act, 25 U.S.C. §§ 70-70v-3 (1946) (repealed). This remedial legislation was passed to settle "claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands or compensation agreed to by the claimant." 25 U.S.C. § 70a. As a result of these claims, the Tribe was awarded judgments against the United States in the 1970s and 1980s, which were held in trust by the Secretary of the Interior.

The Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401 et seq. (the "Distribution Act") governed the distribution of the judgment awards to the Tribe. Pursuant to the Distribution Act, the Tribe and the Secretary of the Interior developed a use and distribution plan which became final and was published in the Federal Register on September 8, 1983 (the "1983 Plan"). 48 Fed. Reg. 40567-01 (Sept. 8, 1983).

Under the 1983 Plan, 70 percent of the funds were distributed pro rata to the members of the Tribe, and 30 percent of the funds were set aside for programming, to be held in perpetual trust by the Secretary of the Interior, with the income from such funds to be used for real estate acquisition, development of the Tribe, including increasing the effectiveness of the government, and the maintenance of the property of the Tribe. As required by the Distribution Act, see 25 U.S.C. § 1407 (stating that "none of the funds which— (1) are . . . held in trust pursuant to a plan approved under the provisions of this chapter . . . shall be subject to Federal or State income taxes"), the 1983 Plan states: "None of the funds distributed per capita or made available under this plan for programing shall be subject to Federal or State income taxes." 1983 Plan, § 6(b).

The 1983 Plan provided that programming funds (*i.e.*, the 30 percent trust fund set asides) were to be used pursuant to a Ten-Year Tribal Acquisition,

Development, and Maintenance Plan ("Ten-Year Plan").[3] The 1983 Plan

specified that the Ten-Year Plan should include as uses for the funds "the

acquisition of additional lands to build upon the tribal land base, the development

of the tribe's assets and to provide for the maintenance and care of the tribal

property." 1983 Plan, § 5(d). The 1983 Plan further provided that "[a]t the end

of the 10-year program period, the [Tribe] shall evaluate the tribal needs as

concerns the remaining balances in the program principal and interest accounts,

and any changes proposed by the [Tribe] shall be subject to approval by the

Secretary." 1983 Plan, §5(d)(iii).

As required by the 1983 Plan, the Tribe and the Secretary of the Interior

developed the Ten-Year Plan. The Ten-Year Plan defined the terms

"acquisition," "development" and "maintenance," as used in the 1983 Plan.

"Development" is defined as "those activities and/or actions undertaken by the

Tribe to in some way cause growth, building up, expansion, strengthening,

increased effectiveness or other evolutionary process toward the program of the

Tribe economically and/or socially and/or governmentally." Ten-Year Plan, §

1.4.

In 1994, the American Indian Trust Fund Management Reform Act of 1994,

25 U.S.C. §§ 4001 *et seq.*, was passed, which, inter alia, allowed tribes to

---

[3] The United States has referred to the Ten-Year Plan in its briefing as the "1985 Guidelines."

5

withdraw and manage any trust funds held by the Secretary of the Interior on their behalf, subject to the approval of the Secretary of the Interior. In 1995, the Tribe members voted to withdraw all trust funds from the control and management of the Secretary of the Interior, and to place control and management of the trust funds with the Tribe. After withdrawal, the funds maintained their status as trust funds. In 1996, the Business Committee of the Tribe passed Resolution 96-44, which authorized Barrett, as the chairman of the Tribe, to effectuate the transfer of the management of the trust funds from the Secretary of the Interior to the Tribe, pursuant to management policies and guidelines that were to be approved by the Secretary of the Interior.

As part of the Tribe's request for approval of self-management of the trust funds, the Tribe also submitted for approval a detailed Investment Management Policy for the investment and use of the trust funds. Under the Investment Management Policy, the purposes and uses for the expenditure of the earnings withdrawn from the trust, pursuant to the annual budget approved by the electorate, remained the same as those in effect during the Secretary of the Interior's tenure as manager of the trust funds (*i.e.*, to acquire real estate, develop the Tribe, and maintain Tribe property).

In 1996, the Secretary of the Interior approved the transfer of the trust funds to the Tribe, subject to the Tribe's use and management of the funds in a manner consistent with the Investment Management Policy. The Tribe now

maintains the trust fund in a separate trust account held with the First National Bank & Trust Company.[4]  The Tribe's trust fund earnings which are to be expended for the year are placed in the Tribe's general fund account as a sub-account, and accounted for separately from the Tribe's general fund monies.  Any earnings from the trust fund that are not included in the budget, or approved for expenditure by the general membership of the Tribe, remain in the trust fund and become part of the principal of the trust fund.  The Secretary of the Interior requires the Tribe to hire an independent auditor to perform a yearly audit of the trust funds.  When completed, the Tribe submits the audit report to the Secretary of the Interior.

In 1996, Barrett concluded that his salary as chairman could be paid from the earnings on the Tribe's trust fund, and that he would not be taxed on that income.  Barrett suggested to the Business Committee of the Tribe that he be paid from those funds, and then he informed the accounting department of this plan.  Barrett also instructed the accounting department not to withhold taxes from his compensation and not to issue a Form W-2 to him.

In 2001, Barrett received $48,057.64 in compensation from the Tribe for his duties as chairman.  This compensation was paid from the trust funds which had been previously managed by the Secretary of the Interior but were now self-

---

[4]  Barrett is chairman of the board of directors of the First National Bank & Trust Company.

managed by the Tribe. The Business Committee of the Tribe, with the approval of the Tribe's general electorate at its annual meeting, directed that the chairman's compensation be paid from the trust funds.

After the completion of an audit, the IRS determined that compensation paid to Barrett by the Tribe was taxable income to Barrett. In June 2005, the IRS issued a notice of deficiency proposing to assess Barrett for additional income taxes for the 2001 tax year. The proposed assessment by the IRS was for income taxes in the amount of $19,355 and penalties of $3871, pursuant to 26 U.S.C. § 6662. These amounts were ultimately assessed by the IRS, and, after payment of all amounts assessed in September 2005, Barrett, in March 2006, requested a refund of the amounts paid pursuant to assessments relating to the compensation which had been paid to Barrett as chairman of the Tribe in tax year 2001.[5] In May 2006, the IRS denied Barrett's refund claim, and Barrett filed his complaint in the district court in September 2006, seeking review of the IRS' denial of his refund claim.

On cross-motions for summary judgment, the district court denied Barrett's motion and granted the motion of the United States. In its order, the district court rejected Barrett's argument that the compensation paid by the Tribe was exempt from income tax because it fell within the 1983 Plan's definition of

[5] Barrett's claim for a refund was timely under 26 U.S.C. § 6511(a), which provides a two-year limitations term, running from the date of payment of the tax.

8

"development" or that the compensation paid to Barrett was a "programming expenditure" under the 1983 Plan. The district court also found that the penalty should be sustained because, while there might be a factual question as to Barrett's subjective good faith, Barrett had not presented sufficient evidence to create a triable issue of fact as to the objective reasonableness of his position regarding the taxability of his salary.

## II

### A. Standard of Review

We review the district court's summary judgment decision de novo, applying the same legal standard used by the district court. ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co., 494 F.3d 1238, 1243 (10th Cir. 2007). Under this standard, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way and is 'material' when it is essential to the proper disposition of the claim." Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006) (internal quotation omitted). When reviewing a grant of summary judgment on appeal, we construe all factual inferences in favor of the party against whom summary judgment was entered. NISH v. Rumsfeld, 348 F.3d 1263, 1266 (10th Cir. 2003).

9

*B. Exemption from Federal Income Tax*

Barrett acknowledges that American Indians, as United States citizens,
generally are subject to the federal income tax. See Squire v. Capoeman, 351
U.S. 1, 6 (1956) ("Indians are citizens and . . . in ordinary affairs of life, not
governed by treaties or remedial legislation, they are subject to the payment of
income taxes as are other citizens."). Barrett claims, however, that his
compensation as chairman is not taxable income because the source of the funds
used to pay him was trust fund money previously awarded by the Indian Claims
Commission to the Tribe, and that funds received from that source are tax exempt.
Aplt. Br. at 15.

Under the Internal Revenue Code, gross income is "all income from
whatever source derived," 26 U.S.C. § 61(a), and an exemption from the payment
of taxes "should be clearly expressed," Squire, 351 U.S. at 6. See also Allen v.
Comm'r, 91 T.C.M. (CCH) 673 (2006), aff'd, 204 F. App'x 564 (7th Cir. 2006)
(unpublished) ("It is well established that Native Americans, or American
Indians, as U.S. citizens, are subject to the Federal income tax unless an
exemption is created by treaty or statute. For such an exemption to be valid, it
must be based upon clearly expressed language in a statute or treaty." (internal
citations omitted)). Barrett claims the 1983 Plan's specification that none of the
funds "made available under this plan for programing shall be subject to Federal

or State income taxes," 1983 Plan, §6(b), is an express exemption for his compensation because his compensation was paid from the programming funds.

Specifically, Barrett argues that his compensation as the chairman of the Tribe furthers the "development" of the Tribe, defined in the Ten-Year Plan as the "growth, building up, expansion, strengthening, increased effectiveness or other evolutionary process toward the progress of the Tribe," Ten-Year Plan, § 1.4. Barrett argues that the chairman's oversight of the Tribe's day-to-day operations is one way of developing "strong and stable tribal governments," Aplt. Br. at 17, which helps achieve the government's expressed goal of "promoting strong tribal economic development, self-sufficiency, and self-governance," id. at 18 (citing the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450 et seq., the Indian Financing Act of 1974, 25 U.S.C. §§ 1451 et seq., Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 510 (1991), and Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 824 n.9 (10th Cir. 2007), as examples in support of the government's "consistent" stated goal of tribal self-sufficiency). Barrett contends the compensation paid to him as chairman fits within the programming aspect of the 1983 Plan, and as such, the express language of the 1983 Plan that exempts the programming funds from tax also exempts his compensation from tax.

We disagree. The express exemption authorized by Congress, for funds "made available under this plan for programing," 1983 Plan, § 6(b), does not

11

encompass the compensation paid to Barrett as the chairman of the Tribe.  The funds available under the 1983 Plan for programming were the funds authorized by the Ten-Year Plan.  The Ten-Year Plan authorized the use of the funds for acquisition, development and maintenance.  Barrett argues his compensation falls within the definition of development, but the Ten-Year Plan defines development as "those activities and/or actions undertaken by the Tribe to in some way cause growth, building up, expansion, strengthening, increased effectiveness or other evolutionary process toward the progress of the Tribe economically and/or socially, and/or governmentally."  Ten-Year Plan, § 1.4.  Barrett's compensation for the oversight of day-to-day operations cannot be considered development under the expressed definition of the term.  Payment of a salary to Barrett, who filled the long-standing and long-defined position of tribal chairman is not an expenditure for an "evolutionary process toward the progress of the Tribe economically and/or socially, and/or governmentally."

In addition, even if the compensation paid to Barrett as chairman of the Tribe would satisfy the intended-use criteria of the programming funds, the tax exemption reference in the 1983 Plan is not sufficiently specific to exempt Barrett's salary from federal taxation.  See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 156 (1973) (noting that the Supreme Court "has repeatedly said that tax exemptions are not granted by implication" and that if Congress intends a tax exemption, "it should say so in plain words.  Such a conclusion can not rest on

12

dubious inferences" (internal quotations omitted)). If the annual compensation paid to a tribal chairman was to be exempt from taxation, it could have been easily and plainly expressed.

As a result, because Barrett's compensation was not expressly exempt from federal income tax, the district court was correct to grant summary judgment in favor of the United States on Barrett's claim for a refund.[6] Although Barrett cites sources which emphasize the government's strong desire for American Indians to progress toward tribal self-sufficiency, this goal does not trump the long-standing requirement that an exemption from the payment of taxes must be explicitly stated. See Okla. Tax Comm'n, 498 U.S. at 510 (noting "Congress' desire to

---

[6] Providing further support, multiple decisions from the Tax Court have held that amounts received by Native Americans for serving as tribal officials are not exempt from tax. See Allen v. Comm'r, 91 T.C.M. (CCH) 673 (2006), aff'd, 204 F. App'x 564 (7th Cir. 2006) (unpublished) (concluding the chairman of tribe was liable for tax on his salary and the fact that the tribe is a non-taxable entity was irrelevant); Doxtator v. Comm'r, 89 T.C.M. (CCH) 1270 (2005) (concluding the tribal official was subject to income tax on compensation received for rendering services to tribe because no exemption was found); Allen v. Comm'r, T.C. Memo 2005-118 (2005) (concluding that payments to tribal executive assistant were taxable income because no treaty or legislation exempted the payments); Hoptowit v. Comm'r, 78 T.C. 137, 145-48 (1982), aff'd, 709 F.2d 564 (9th Cir. 1983) (concluding that a tribal council member was liable for tax on payments received from the tribe's trust funds); Jourdain v. Comm'r, 71 T.C. 980, 987 (1979), aff'd, 617 F.2d 507 (8th Cir. 1980) (concluding that a tribal chairman's salary paid from tribal trust funds is taxable to the tribal chairman). Although none of these cases has the same facts and purported exemption from tax as that urged herein, see Aplt. Reply Br. at 7-9 (discussing how cases are factually dissimilar), they provide support for our holding because they all refuse to find an exemption where none is expressly provided.

13

promote the goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development" and therefore refusing to "modify the long-established principle of tribal sovereign immunity" (internal quotations omitted)); Squire, 351 U.S. at 6-7 (recognizing that the United States has authority to tax American Indian U.S. citizens as long as there is no express exemption from tax).

## C. Accuracy-Related Penalty

Section 6662 of the Internal Revenue Code imposes a 20 percent accuracy-related penalty on the portion of underpayment of tax attributable to negligence or disregard of rules or regulations. See 26 U.S.C. §§ 6662(a) (mandating a tax "equal to 20 percent of the portion of the underpayment"), 6662(b)(1) (applying penalty for "[n]egligence or disregard of rules or regulations").

The "negligence" contemplated by the statute is "any failure to make a reasonable attempt to comply with the provisions" of the tax law. Id. § 6662(c). "Negligence is defined as the 'lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances.'" Van Scoten v. Comm'r, 439 F.3d 1243, 1252 (10th Cir. 2006) (quoting Anderson v. Comm'r, 62 F.3d 1266, 1271 (10th Cir. 1995)).

The term "disregard" includes "any careless, reckless, or intentional disregard of rules or regulations." Treas. Reg. § 1.6662-3(b)(2). Disregard of rules or regulations is careless if "the taxpayer does not exercise reasonable

14

diligence to determine the correctness of a return position" and is reckless if "the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe."  Treas. Reg. § 1.6662-3(b)(2); see also Neely v. Comm'r, 85 T.C. 934, 947 (1985) (stating that negligence is lack of due care or failure to do what a reasonable person would do under the circumstances).

Under § 6664(c)(1), however, no penalty will be imposed "if it is shown that there was a reasonable cause for such [underpayment] and that the taxpayer acted in good faith with respect to such [underpayment]."  26 U.S.C. § 6664(c)(1) (emphasis added).  "The determination of whether a taxpayer is entitled to [this] exception 'is made on a case-by-case basis, taking into account all pertinent facts and circumstances.'"  Van Scoten, 439 F.3d at 1259 (quoting Treas. Reg. § 1.6664-4(b)(1)).  "Reasonable cause and good faith might be indicated by 'an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer,' but 'reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect.'"  Id. (quoting same).

Regarding the imposition of penalties in cases commencing after July 22, 1998, § 7491(c) places the burden of production on the IRS, "in any court proceeding with respect to the liability of any individual for any penalty."  26

15

U.S.C. § 7491(c).  As a result, the government had the burden of coming forward in the district court with sufficient evidence to support imposition of a penalty on Barrett.  Higbee v. Comm'r, 116 T.C. 438, 446 (2001).

Barrett argues that the district court erred by not requiring the United States to meet its burden of production under § 7491(c).  Aplt. Br. at 24-26.  The United States responds that the facts stipulated by the parties were sufficient to meet the government's burden of production, but in its briefing points to no specific stipulations at all, let alone stipulations which fall within the definition of negligence outlined above.[7]  See Aple. Br. at 27.  The district court addressed the summary judgment motions regarding the penalty by analyzing "whether the plaintiffs have set out sufficient evidence to create a material fact question as to the propriety of the accuracy-related penalty under 28 U.S.C. Sec. 6662."  Aplt.

---

[7]  At oral argument, the United States argued its burden of production was met by merely establishing that the income received by the taxpayer was taxable and was not disclosed, citing Allen v. Comm'r, 2005 T.C.M. 118 (RIA) (2005).  However, the penalty provision at issue in Allen was 26 U.S.C. § 6662(b)(2).  Section 6662(b)(2) provides for an accuracy-related penalty for any "substantial understatement" of income tax.  A "substantial understatement" occurs when "the amount of the understatement for the taxable year exceeds the greater of—(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000."  26 U.S.C. § 6662(d)(1)(A)(i)–(ii).  Therefore, the United States met its burden of production in Allen by showing an underpayment had occurred and by simply pointing out the amount of the underpayment.

Here, § 6662(b)(1) negligence, not § 6662(b)(2) "substantial understatement," is at issue.  Therefore, Allen is not persuasive authority for concluding that Barrett's failure to report his compensation as taxable income is sufficient to meet the United States' burden on § 6662(b)(1) negligence.

16

Br. Ex. A at 10.  The district court then set out the legal standards for the imposition of a penalty, but never addressed the United States' burden of production to show negligence.  The district court simply addressed whether Barrett had met the "reasonable cause and good faith" exception to the negligence standard permitted by § 6664(c)(1).  Id. at 11-14.

However, because we are convinced that the record adequately supports the imposition of the accuracy-related penalty, and because the parties have had a fair opportunity to address whether the penalty should apply, we affirm the district court.  See Thomas v. City of Blanchard, 548 F.3d 1317, 1327 n.2 (10th Cir. 2008) (holding that "we can affirm on any ground adequately supported by the record 'so long as the parties have had a fair opportunity to address that ground'" (quoting Shero v. City of Grove, 510 F.3d 1196, 1201 n.2 (10th Cir. 2007))).  The parties contested the imposition of the accuracy-related penalty, and the related burden of production, in their summary judgment briefings.  E.g., ROA Vol. II at 276-79 (United States' memorandum in support of motion for summary judgment; recognizing burden of production on penalty and arguing that Barrett was liable for the penalty because he intentionally failed to disclose his income despite the lack of authority supporting his position); id. at 331-32 (Barrett's cross-motion for summary judgment; recognizing that the United States has the penalty burden of production and arguing the United States' burden had not been met); id. at 359-61 (Barrett's response to the United States' motion for summary judgment;

17

arguing that United States failed to meet its burden of production); id. at 384-88 (United States' response to the penalty portion of Barrett's cross-motion for summary judgment).

We may infer from the parties' stipulation of facts that Barrett relied only on his personal reading of the law to form the conclusion that his compensation was nontaxable. See ROA Vol. I at 28, ¶ 37 ("On or after 1993, Barrett became aware of certain rulings of the Internal Revenue Service, including Revenue Ruling 59-354 regarding the taxability of amounts paid to tribal council members or otherwise exempt by statute or treaty. In 1996, Barrett concluded that he could be paid from the earnings accrued from the Tribe's trust fund and that he would be exempt from taxes from such income, so he suggested to the Business Committee that he be paid from the trust fund."). A reasonable taxpayer in Barrett's position would not rely solely on his or her own analysis of the law to conclude his compensation was exempt. He was confronted with complicated legal authority, compensation is normally taxed, and he did not seek professional advice. The evidence was sufficient to sustain the United States' burden of production.

We also affirm the district court's finding that Barrett had not shown reasonable cause for the underpayment of his taxes, and therefore did not rebut

18

the United States' showing on the accuracy-related penalty.[8] The district court

found:

> The only authority to which the plaintiffs point in justifying the reasonableness of their filing was their reading of Revenue Ruling 59-384, particularly its reference to income potentially being exempt due to treaties or statutes, and their reading of the various statutes and plans adopted pursuant to them. However, the referenced revenue ruling clearly points out the general principles of law applicable in this area: that payments to tribal members are includable in the member's gross income unless an exemption "derive[s] plainly" from a statute or treaty. The relatively convoluted argument upon which the plaintiffs rely to trace their theory of non-taxability cannot be said to be "plain" by any stretch. Not only is it contrary to the general principles of taxability of payments to tribal members, but it also substantially misreads the statutes in question, taking provisions of them which are directed to taxation of the Tribe and applying them instead to taxation of the recipients of tribal funds. It applies various tax exemption provisions in ways and contexts outside their proper scope. In any event, the court concludes that the plaintiffs' position as to the tax treatment of Barrett's salary, though inventive, is outside the bounds of what can be termed objectively reasonable. Under these circumstances, the court concludes that the underpayment was attributable to negligence or disregard and the penalty was therefore properly imposed.

---

[8] The district court stated that if the penalty question turned only on Barrett's subjective good faith, it would likely conclude that this would create a fact issue. ROA Vol. II at 407-08. Because we affirm the district court on the "reasonable cause" prong, we need not reach the "good faith" prong of the 26 U.S.C. § 6664(c)(1) exception to the imposition of an accuracy-related penalty. See 26 U.S.C. § 6664(c)(1) (stating that no penalty will be imposed "if it is shown that there was a reasonable cause for such [underpayment] and that the taxpayer acted in good faith with respect to such [underpayment]" (emphasis added)).

19

ROA Vol. II at 408-09 (internal footnotes omitted).

The determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The most important factor is the extent of the taxpayer's effort to assess the proper tax liability. Id. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer." Id.

For substantially the same reasons expressed by the district court, we conclude that Barrett did not establish reasonable cause for the underpayment of taxes, and therefore did not rebut the United States' showing on the accuracy-related penalty. Barrett's determination that the salary paid to him as chairman of the Tribe was exempt from federal income tax is not reasonable in light of Barrett's experience, knowledge, and education. Barrett made no effort to ascertain his tax status beyond his own interpretation of the convoluted, historical legislation, revenue regulations, and tribal treaties. Barrett's efforts to assess his proper tax liability for his salary as chairman were incredibly minimal—almost non-existent. As a result, Barrett has raised no genuine issue of material fact with respect to reasonable cause for his tax underpayment, and the district court was correct to grant summary judgment in favor of the United States on the accuracy-related penalty.

20

## III

We AFFIRM the district court's order granting summary judgment to the United States.